The defendant is charged as principal; the moving cause; the actor.

The question was passed upon in State v. Flint, 33 La. Ann. 1291. The court held that the offense as charged in one count was not a fatal defect.

It has been decided that, under an indictment charging defendant with the act, he may be convicted upon proof of procuring the act to be done by another in his presence. McClain, Criminal Law, p. ——, § 801; Id. p. ——.

Doing and procuring of one and the same instrument may be charged in one count; denounced in one statute. McClain, Criminal Law, p. 801, § ——; Id. ——.

For reasons assigned, the verdict, sentence, and judgment are affirmed.

---

(53 South. 705.)

No. 17,840.

### J. M. GUFFEY PETROLEUM CO. v. MURREL, Tax Collector, et al.

(Nov. 14, 1910. On Application for Rehearing, Dec. 12, 1910.)

*(Syllabus by the Court.)*

1. MUNICIPAL CORPORATIONS (§ 967*)—EXEMPTION FROM TAXATION—PROPERTY EMPLOYED IN "MINING OPERATIONS"—"MINE."

Article 230 of the Constitution of 1898 provides: "There shall also be exempt from parochial and municipal taxes for a period of ten years from the first day of January, 1900, the capital, machinery, and other property employ-

ed in mining operations." A mining operation has to do with the working of a mine, and neither in the ordinary, nor in the scientific, acceptation of the term "mine," is the term "oil well" included.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 967.*

For other definitions, see Words and Phrases, vol. 5, pp. 4511, 4512.]

2. TAXATION (§ 204*)—EXEMPTION—CONSTRUCTION OF STATUTES.

Laws granting exemptions from taxation must be strictly construed, and so the operation of an oil well cannot be held to be within the exemption granted to those engaged in mining operations.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 321, 322, 325, 332, 333; Dec. Dig. § 204.*]

3. TAXATION (§ 418*) — ASSESSMENT—ASSESSMENT IN IMPROPER NAME—WAIVER.

If a corporation has been previously assessed in the name of the "Guffey Oil Company," and has made no complaint, it cannot enjoin a seizure of its property to pay taxes on the ground that this is an illegal and insufficient assessment, as its name is the "J. M. Guffey Petroleum Co." The name and description was sufficient to form the basis of a proper assessment.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 707–710; Dec. Dig. § 418.*]

*(Additional Syllabus by Editorial Staff.)*

4. WORDS AND PHRASES — "MINE" — "QUARRY."

A "mine" is a large opening into the ground made to obtain metal ores or coal, as distinguished from a "quarry," which is a place where building stone or building material of any kind, as lime, cement, etc., is obtained.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 7, p. 5881.]

5. MINES AND MINERALS (§ 48*)—"ORE."

"Ore" is a metalliferous mineral or rock, especially one which is of sufficient value to be mined.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 134; Dec. Dig. § 48.*

For other definitions, see Words and Phrases, vol. 6, p. 5052.]

6. TAXATION (§ 233*)—MINERAL WATERS.

Mineral waters are not classed as minerals; nor is mineral oil a mineral within the intendment of article 230, Const. 1898, which exempts from taxation property employed in mining operations.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 134; Dec. Dig. § 233.*

For other definitions, see Words and Phrases, vol. 5, pp. 4513–4515; vol. 8, p. 7722.]

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Wm. Campbell, Judge.

Action by the J. M. Guffey Petroleum Company against J. L. Murrel, Tax Collector, and others. Judgment for plaintiff, and defendants appeal. Reversed.

James L. Dormon and Lewis & Lewis, for appellants. Story & Pugh and Carlton & Townes, for appellee.

## Statement of the Case.

NICHOLLS, J. The plaintiff, a corporation organized under the laws of Texas and domiciled in the city of Beaumont in that state, alleged: That long prior to the acquisition of the lands and properties described in its petition, and long prior to the 1st of January, 1907, it had filed with the Secretary of State of Louisiana a declaration of the place of locality of its domicile, together with the name of its agent or officer in the said state of Louisiana, representing said corporation, upon whom services of process could be made, and had in all things complied with the Constitution and laws of the state of Louisiana, and that it was, on the 1st day of January, 1907, and at all times thereafterwards, duly authorized to do business in the state of Louisiana, and especially to do the business the nature and character of which is hereafter disclosed.

That on the said 1st day of January, 1907, in conjunction with one T. H. Bass, it was the owner and was in possession of the land and property and property rights and privileges hereafter set out; it, the said plaintiff, owning an undivided one-half interest therein, and the said T. H. Bass owning the other undivided one-half interest therein. That said property was situated in the parish of Acadia, state of Louisiana, and being described as follows, to wit: All the rights, privileges, and immunities of the lessee in a certain oil or mineral lease executed on the

23d day of March, 1903, by the Jennings-Heywood Oil Syndicate to George Harrison Morse, Fred F. Morse, Charles Stoddard Morse, George A. Morse, and Avery C. Wilkins, said lease being concurred in by one L. Arnoudet, same the following described property, to wit:

Situated in the northwest corner of section 47, township 9 south, range 2 west La. Mer. Beginning at the northwest corner of section 47; and running thence approximately south along the line of said section 47, 417.42 feet; thence running approximately east on a line parallel with the north line of said section 47, 216.42 feet; thence running approximately north on a line parallel with the west line of said section 47 to the north line of said section; thence running approximately west with the north line of said section 47 to the place of beginning. Which lease is duly recorded in the conveyance records of the parish of Acadia, La., and said instrument is hereby referred to; this lease or instrument giving the right to the lessee to develop the said land and produce petroleum oil therefrom upon the payment of a fixed royalty therein provided.

Also, the rights of lessee granted and given by a certain oil or mineral lease hereinafter described covering the following described tract of land, to wit:

Beginning at the northeast corner of the two acres just above described, which said beginning point in the north line of section 47, 216.72 feet east from the northwest corner of said section; thence approximately south parallel with said section 47 and along the east line of said two-acre tract a distance of 417.42 feet; thence east parallel with the north line of said section a distance of 54.18 feet; thence approximately north parallel with the west line of said section a distance of 417.42 feet to the north line of said section; thence west a distance of 54.18 feet to the place of beginning. Said one-half acre of ground being described in a mineral lease executed by the Ladies Oil Company, Limited, to George A. Morse of date January 2, 1905, passed before Charles R. Kline, notary public, duly recorded in the records of conveyances of the parish of Acadia, state of Louisiana; and also described in a certain lease and mineral contract executed by the Bienville Oil Company to the Morse Oil Company of date April 20, 1905, passed before Charles R. Kline, notary public, to which said instrument and the records thereof reference is hereby made, the interests of the lessees being shown by said leases above described, which oil or mineral leases were in the usual form and conveyed to the lessee therein a right to develop the land and produce oil therefrom upon the payment of the royalty therein provided.

Also, all the right, title, and interest as lessee in and to a certain three acres of land described as one-acre tracts as follows: First tract: Starting at a point in the section line between sections 46 and 47, township 9 south, range 2 west La. Mer., 417.42 feet from the northwest corner of section 47, running in a southerly direction on and along said section line a distance of 208.71 feet to corner; thence in an easterly direction on a line parallel to the north line of said section 47, 216.72 feet, to corner; thence in a northerly direction on a line parallel to the west line of said section 47, 208.71 feet, to corner; thence in westerly direction in a line parallel to the north line of said section 47, 216.72 feet, to corner and place of beginning, containing one acre of land.

Second tract: Starting at a point in the north line of section 47, township 9 south, range 2 west La. Mer., 325.8 feet east from the northwest corner of said section 47; thence in southerly direction in a line parallel to the west line of said section 47, a distance of 417.42 feet, to corner; thence in an easterly direction on a line parallel to

the north line of said section 47, a distance of 108.36 feet, to corner; thence in a northerly direction in a line parallel to the west line of said section 47, a distance of 417.42 feet, to corner in north line of said section 47; thence in a westerly direction with the north line of section 47, a distance of 108.36 feet, to corner and place of beginning, containing one acre of land. Third tract: Beginning at a point in the north line of section 47, township 9 south, range 2 west La. Mer., 433.44 feet in an easterly direction from the northwest corner of said section 47; thence in a southerly direction in a line parallel with the west line of said section 47, 417.42 feet, to corner; thence in an easterly direction on a line parallel with the north line of section 47, 108.36 feet, to corner; thence in a northerly direction on a line parallel to the west line of said section 47, a distance of 417.42 feet, to corner; thence in a westerly direction with the north line of said section 47, a distance of 108.36 feet, to corner and place of beginning, containing one acre of land.

The rights of the lessee in said three acres of land are shown by a contract in the nature of a lease made between the Jennings-Heywood Oil Syndicate and the Morse Oil Company on the 29th day of April, 1904, acknowledged on said date before J. H. Heinen, notary public, in which said contract the lessee was given the right to develop said land and produce oil therefrom on the payment of a certain royalty fixed in said contract. All the rights granted to the Morse Oil Company (which have since been acquired by the plaintiff herein) in and by virtue of a contract executed on December 14, 1905, by W. H. Lovegrove to the Morse Oil Company, whereby the Morse Oil Company, in consideration of the payment of $1,000 to said Lovegrove, obtained certain rights in and to the 100 feet square in acre 15 in the Arnoudet tract in the Mamou or Jennings oil field in Acadia parish, La., obtained by Lovegrove and McIntosh from the West Virginia Oil Company, the rights in which were acquired by the said Lovegrove from the partnership of Lovegrove & McIntosh under which contract made with Lovegrove the Morse Oil Company secured the right to operate for oil and gas upon said tract of land as is shown by the said contract, which is hereby referred to. The land covered by the contract so executed by Lovegrove to the Morse Oil Company is the same land leased to Lovegrove & McIntosh by the West Virginia Oil Company on the 25th day of January, 1905, and is a tract 100 feet by 100 feet out of acre 15 of the Arnoudet tract in the Mamou or Jennings oil field in Acadia parish, La., which lease is referred to. The rights of the said Morse Oil Company (which have been acquired by plaintiff herein) was the right to develop said land and produce petroleum oil therefrom.

Also, all the rights of lessee granted by a certain oil or mineral lease executed by the Jennings-Haywood Oil Syndicate to the Morse Oil Company concurred in and ratified by Jules Clement and the Lyons Oil Corporation passed on before J. H. Heinen, notary public, October 15, 1903, and covering the following described tract of land:

Beginning at stake in the south line of block 14 of the Jules Clement tract of land in fractional section 46, township 9 south, range 2 west La. Mer., as shown by a plat of subdivision in full in the clerk's office of said Acadia parish, and marked "plat showing subdivisions into acres and fractions of blocks in fractional section 46, township 9 south, range 2 west La. Mer., a part of holdings of Jennings-Heywood Oil Syndicate, surveyed and certified by J. F. Harvey and W. H. Garrot, said stake being situated 20 feet to the eastward of the southwest corner of block 14"; thence southward 321.47 feet in a line parallel to the west line of fractional

section 46 and 20 feet distant from said line to stake for corner; thence eastward on a line parallel to the south line of block 14, 135.05 feet, to a stake for corner; thence northward 321.47 feet on a line parallel with the west line of fractional section 46; thence westward and along the south line of block 14, 135.05 feet, to stake for corner and place of beginning, containing one acre of land, together with all buildings and improvements thereon. Which conveyance is duly recorded in the records of conveyances of the parish of Acadia, La., and is hereby referred to.

Which said right of said lessee, as created by said contract, was the right to develop said land and produce petroleum oil therefrom upon payment of certain royalties provided in said instrument. Also, three certain earthen storage tanks situated in the southeast corner of the northeast one-fourth and in the northeast corner of the southeast one-fourth of section 42, township 9 south, range 2 west La. Mer. The said earthen storage tanks are located on land not owned by the plaintiff herein nor by the grantors of plaintiff herein, but the right claimed by the plaintiff herein is the right to the use of said earthen storage tanks for the accommodation of petroleum oil produced from the land above described.

Also, certain personal property connected with and in active use of the business of developing and marketing oil from the land described, consisting of rotary drilling rigs, cable drilling rigs, pumping rigs, pumping engines, pipe, tubing boilers, wooden and steel tanks, and various and sundry other articles of machinery and merchandise used in connection with the business of developing said land and producing and handling petroleum oil therefrom.

That on or about the month of June, 1907, the said plaintiff herein, the J. M. Guffey Petroleum Company, purchased from T. H. Bass all of his interest in the property and property rights of whatever nature or kind hereinbefore described. That on or before the 1st day of June, 1907, and up to the time that the plaintiff herein bought the interest owned by the said Bass in the said property, this plaintiff, together with the said Bass, appeared to be the owners of the said property upon the books of the recorder's office in the parish of Acadia, state of Louisiana, and that, after the purchase made by this plaintiff from the said Bass, it (the plaintiff) appeared to be the sole owner of the said property on the books of the recorder's office of said parish.

That, from time to time during the year 1907, the said J. M. Guffey Petroleum Company placed certain property in the way of machinery and appliances on the land necessary to be used in the conduct of its business of producing oil from said land and marketing and handling same. That, during the time the said Bass was a conjoint owner with this plaintiff in the said property, the whole of the said property was used by it in the production, handling, and marketing of petroleum oil therefrom, and, since said purchase from the said Bass, the whole of the property above described has been used by this plaintiff in the production, handling, and marketing of petroleum oil therefrom.

That on the 1st day of January, 1907, and at all times thereafterwards, it and the said Bass (from whom it acquired an interest in the property) were using said property solely in the production, handling, and marketing of petroleum therefrom, and the said land, and each and every article of personal property connected therewith, were used and were necessary to be used in the production, handling, and marketing of petroleum oil therefrom, and that its business and the said business of the said Bass, so conducted in respect to said property during the whole of said time, was a mining operation within the terms of the Constitution of the state of Lou-

isiana, and all of said land, and all of said personal property connected therewith, and all of the rights therein exercised or in any way used by this plaintiff in connection with said Bass during the said time in question, that is, on January 1, 1907, and at all times thereafterwards, was a mining operation, and the same represented and was capital, machinery, and other property employed in mining operations within the terms and meaning of the Constitution of the state of Louisiana. That the sole use for which the said property is and has been held during the said period of time was to produce petroleum oil therefrom. That the said plaintiff and the said T. H. Bass during the time he was a part owner therein were, in respect to said land, engaged in the business of producing oil from oil wells located on said land, and in the sinking of additional wells thereon, and in producing oil therefrom, and in the marketing, handling, and making available to themselves the oil produced therefrom. That the business that plaintiff was engaged in, the character of which is hereinabove discussed, is and was a mining operation. That the oil on hand at any time coming from the said land represented and was capital, machinery, and other property employed in mining operations, was the avails of its business, conducted as aforesaid, and it (the plaintiff) here alleges that the whole of the same was, under the Constitution of the state of Louisiana, exempt from parochial and municipal taxation for the year 1907. And said petitioner further represents that on the 1st day of January, 1907, and at all times thereafterwards, this petitioner for itself, during the time that it was the sole owner of the said property, and it together with the said Bass during the time that the said Bass was conjointly interested with it in the ownership of the said property, employed not less than five hands in the conduct and management of said business; this being necessary to the proper conduct of its business, the character of which has been hereinbefore given.

That, notwithstanding such exemption under the Constitution, the assessor of the parish of Acadia, state of Louisiana, has attempted to assess for taxes for the year 1907 the said property above described and had attempted to assess against the said property certain parochial taxes, the exact amount and nature of which would hereinafter be given; the exact words of said assessment being as follows:

For the use and value of pipings, earthen, wooden and iron tanks in the Jennings oil field, tools, implements, oil well on Martin lands, also on lands of L. Arnoudet, in section 47, township 9, range 2 west, including wells Nos. 1, 2, 6, and 12 on Martin I lease and wells Nos. 7 and 8 on R. E. Brooks lease and all wells on hand January 1st, and including all the property which were sold to T. J. Bass by the Morse Oil Company.

| | |
|---|---|
| State Tax | $125 00 |
| Parish Tax | 125 00 |
| Fourth Ward Road Tax | 100 00 |
| | $350 00 |

That, as a matter of fact, the assessment so made by the assessor purports to be against the Guffey Oil Company, and is, in no sense, a proper assessment against this plaintiff; but it is averred: That said attempted assessment is asserted and claimed by the officers representing the parish of Acadia to be a charge against the property of the plaintiff herein, a description of which has hereinbefore been given. That the gross valuation put upon said property by the assessor of the parish of Acadia, and the police jury of said parish, amounts to $25,000; this being given as the aggregate value of all of the hereinabove described property assessed in the terms hereinabove set out. Plaintiff shows: That the state tax attempted to be assessed against said property for the year 1907 amounts to $125. That certain interest and other costs claimed by the parish against this plaintiff and against other property amounts to $7.25, which said

amount of state tax, as well, also, as said charges amounting to $132.75, this plaintiff had paid and here exhibits the receipt of the tax collector of Acadia parish, to wit, the sheriff of said parish, the defendant herein, showing the payment of $132.25, which said tax receipt was marked "Exhibit B." That, in addition to the said tax so paid by the plaintiff herein, the said parish, the police jury (whereof J. Kenneth Toler is president), and the said J. L. Murrel, defendants herein, were claiming a right to collect from this plaintiff $325 parochial tax under an ordinance levying a tax for general parochial purposes adopted November 13, 1907, and an ordinance levying a special four-mill tax for road purposes in the Fourth ward of the parish, adopted August 27, 1907.

That notwithstanding said parochial tax, amounting to $325, was not assessable against the said plaintiff, the said defendant herein, J. L. Murrel, sheriff and tax collector of Acadia parish, had demanded, and was demanding, the payment thereof, and had notified petitioner that, should it fail to pay said taxes, he would proceed to advertise and sell said property and appropriate the proceeds of said sale to the payment of said illegal tax; said property being now ordered for sale for said pretended tax on 16th of January, 1908. That the said sheriff has procured to be delivered to this plaintiff a notice addressed to Guffey Oil Company "Beaumont, Tex.," advising that he will sell said property unless said tax be paid, a copy of which said notice is hereto attached, marked "Exhibit C," and made a part hereof and hereby referred to. That although the plaintiff has paid all of the taxes properly assessable against it, and although the said assessment against the said plaintiff and its said property on account of parochial taxes is null and void, and of no force and effect, the said defendant herein persists in his demand for the collection, and threatens to and will attempt to sell the said property of the plaintiff herein unless he be restrained from so doing. Plaintiff shows: That while the assessment, a copy of which appears hereinabove, does not accurately describe the property of this plaintiff, and while the assessment is not made against this plaintiff by name, it is shown and here averred to be fact that this plaintiff was intended to be designated under the appellation of the "Guffey Oil Company," and the property attempted to be described in said assessment is the property and no other than that owned and used by this plaintiff as hereinabove described, and the sale threatened to be made by the defendant herein is intended to be a sale of the said property so owned by the plaintiff and will or might, if permitted to be made, cover and include at least portions of the property actually owned by said plaintiff as hereinbefore set out.

That, in order to protect it and its property from such illegal seizure and sale, it was necessary that an injunction be issued, and that, unless said injunction was issued, the said sheriff would execute his threat and proceed to make said sale.

That it now here offers to make a bond in such terms and for such amount as the court may require, and it signifies its willingness to comply with any order legally made by this court in the premises.

In view of the premises, petitioner prays: That a rule nisi issue herein to Joseph L. Murrel, sheriff of the parish of Acadia, and to the police jury of the parish of Acadia, represented by its president, J. Kenneth Toler, and to Alex Lormand, assessor of the parish of Acadia, as in law in such cases made and provided, to show cause, if any they have, why a writ of injunction should not issue herein directed to the sheriff of the parish of Acadia, and to the said police jury of the parish of Acadia, restraining, prohibiting, and enjoining them and each of

them from selling, or attempting to offer for sale, the property of petitioner, illegally assessed as aforesaid for the year 1907, for the parochial taxes, general and special. That, after due hearing on said rule, peremptory injunction issue herein so restraining, enjoining, and prohibiting said Jos. L. Murrel and the police jury of the parish of Acadia, from selling, or attempting to sell, or offering for sale, the property of petitioner, for the taxes illegally levied upon the assessment of petitioner's property as appears on the assessment rolls for the taxes for the year 1907, parochial, general, and special, as aforesaid.

That Jos. L. Murrel, the said police jury of the parish of Acadia, through its president, J. Kenneth Toler, and A. C. Lormand, assessor of the parish of Acadia, be cited to answer hereto, and, after due hearing, that the assessment and taxes against petitioner's property for parochial taxes, general and special, be declared null and void; same being exempt from taxation for parochial purposes under the Constitution of the state of Louisiana. That said A. C. Lormand and the said police jury be directed to strike out the assessment of the property of petitioner on the assessment rolls as made by said assessor and approved by the police jury of the parish of Acadia, acting as a board of review, in so far as said assessment attempts to fix a charge against petitioner or its property, the parochial taxes, general and special, and has been illegally assessed and the parochial taxes levied thereon by the police jury for the parochial taxes for the year 1907, are null and void, and that petitioner's property be declared to be relieved from the payment of said parochial taxes.

Petitioner further prayed that said writ of injunction be maintained and perpetuated, and prayed for general and equitable relief in the premises.

On reading the petition, the district court ordered that a rule nisi issue directed to the sheriff of the parish of Acadia, ex officio tax collector, the police jury of the parish of Acadia, and the assessor of said parish, to show cause, if any they had, why a writ of injunction should not issue and the relief prayed for be not granted as prayed for.

On trial of the rule a preliminary writ of injunction was ordered to issue, and was accordingly issued.

The defendant thereafter answered. After pleading a general denial, they admitted that the taxes sought to be annulled were duly and legally assessed against the property of the plaintiff set out in its petition, and that the sheriff and ex officio tax collector was proceeding according to law to enforce the payment of said taxes when the writ of injunction issued herein. Defendant specially denied that petroleum oil was a mineral either in the common acceptation of the term or in a scientific sense or in the sense contemplated by the Constitution, and they specially denied that prospecting for same is in any sense a mining operation.

Defendants averred: That whatever, if any, prospecting for or obtaining of petroleum oil was done or performed by the plaintiff in Acadia parish by or with the aid of or upon any of the property set out in its petition, was done and performed simply and solely by drilling small holes, less than 12 inches in diameter, into the ground, and no pits nor excavations nor mines have been by the plaintiff opened or operated in Acadia parish, and such operations as it had conducted were not mining operations in the common acceptation of the term, nor in a technical sense, nor within the intendment and meaning of the Constitution of the state of Louisiana, and none of the property set out in plaintiff's petition was exempt from taxation.

That none of the property enumerated in plaintiff's petition was exempt from the payment of the special road tax for the further and additional reason that the said tax was

duly and legally voted by the taxpayers of the road district in which the property was located long after the adoption of the Constitution of 1898.

In view of the premises, defendants prayed that the exceptions filed by them in answer to the rule nisi be maintained and plaintiff's suit be dismissed and injunction dissolved and for 10 per cent. attorney's fees as allowed by law, and, if the said exceptions be not maintained, then upon trial of the merits that the demands of the plaintiff be denied and rejected, and that the writ of injunction issued herein be dissolved, and that the defendants have judgment against the plaintiff and the surety on its injunction bond in solido as provided by law for attorney's fees at the rate of 10 per centum per annum on the amount of the taxes of which the payment was enjoined with interest, penalties, and cost added thereto, and for cost and all necessary orders and decrees, and for general relief.

The district court rendered judgment ordering, adjudging, and decreeing that the writ of injunction which had issued in the case be maintained and perpetuated, and that the sheriff of the parish of Acadia, and the police jury of the aforesaid parish, be forever restrained, prohibited, and enjoined from selling, or attempting to offer for sale, the property described in plaintiff's petition herein for general and special parochial taxes levied on the property of the plaintiffs as is assessed on the assessment rolls of the parish of Acadia for the year 1907.

It further ordered, adjudged, and decreed that the assessment and taxes against the property of the plaintiff referred to in this petition were null and void, and that the said property was exempt from taxation, special and general, for parochial purposes under the Constitution of the state of Louisiana for the year 1898. The assessor of the parish of Acadia and the police jury of said parish, through its president or its proper

officers, were commanded and directed to strike out the assessment on the property of the plaintiff, J. M. Guffey Petroleum Company from the assessment rolls as made by the assessor of the parish of Acadia, and of the police jury of the said parish, acting as a board of review in so far as said assessment attempted to fix a charge against the said J. M. Guffey Petroleum Company and a lien on its property for parochial taxes, either general or special, or both.

It further ordered, adjudged, and decreed that the taxes levied by the police jury of the parish of Acadia, both general and special, for the year 1907, be, and they are hereby, decreed null and void; that the property of the plaintiff be relieved from the payment of the said parochial taxes, general and special, as aforesaid.

It further ordered, adjudged, and decreed that the costs of this suit be paid by the defendants.

Defendants have appealed.

### Opinion.

Defendants in injunction in their brief maintain that at the time it is a matter of history, when the Constitution of 1898 was framed, there were no oil wells in the state of Louisiana, no profitable deposits of oil were known to exist within the state, and we believe we are safe in saying that few or none of our citizens ever dreamed of the possibility of Louisiana becoming a producer of petroleum oil in profitable quantities. Hence, it seems to us, a conclusive presumption that not one of the framers of our Constitution had in mind any such thing as oil or the drilling of oil wells when article 230 was written.

This being the case, the only possible way by which the plaintiff can obtain the exemption under the language used is to show conclusively that the drilling of oil wells and the handling of the product therefrom is a "mining operation," not only in a techni-

cal or scientific sense, but also within the common acceptation of the term.

"The words of a law are generally to be understood in their usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words." Civ. Code, art. 14.

Let us then see what is really a "mine" and a "mining operation" as "understood in their most usual signification," as shown by respectable authorities. The Century Dictionary defines a "mine" to be:

"An excavation in the earth made for the purpose of getting metal ores, or coal. Mine work in metal mines consists in sinking shafts and winzes, running levels and stoping out the contents of the mines thus made ready for removal. In coal mining the operations differ in detail from those carried on in connection with metal mines, but are the same in principal. The details vary in coal mining with the position and thickness of the beds. A mine differs from a quarry in that the latter is usually open to the day but in any mine a part of the excavation may be open work (see that word) as in running an adit level which may be carried a considerable distance before coming covered by earth or rock. When the term mine is used, it is generally understood that the excavation so named is in actual course of exploitation otherwise some qualifying term like abandoned is required. No occurrence of ore is designated as a mine unless something has been done to develop it by actual mining operations. There are certain excavations which are termed neither mines nor quarries, as, for instance, places where clay is being dug out for brick; such places are frequently (especially in England) called pits and also open works. With a few and not easily specified exceptions a quarry is a place where building stone or building material of any kind (as lime, cement, etc.) are being got; a mine where some metal or metalliferous ore is in the process of exploitation. * * * "

The same authority defines "ore" as:

"A metalliferous mineral or rock, especially one which is of sufficient value to be mined."

It will be noted that, in defining the word, "excavation," usually made use of in describing some large kind of opening, is employed. It will also be noted that only three objects are designated as being those for which a mine is opened; that is, metal, ores, or coal. It will further be noted that throughout the definition the words "quarry" and "pits" both also signifying large openings in the earth, are employed as almost synonymous with the word "mine," and it is shown from the language used that the three terms are extremely similar, so much so that considerable trouble is taken to explain the slight difference between the three terms. A reading of the entire definition fixes indelibly upon the mind the idea that a "mine" is: First, a large opening into the ground like a pit or quarry; second, that only such openings are mines as are made for the purpose of getting metal, ores, or coal. We submit that the definition above quoted is an absolutely faithful and accurate statement of what constitutes a "mine" in the most usual signification of the word. There is nothing whatever in this definition which would even remotely suggest that a small opening less than 12 inches in diameter drilled into the ground for getting out oil could possibly be termed a "mine." It is shown in the evidence that the plaintiff's wells were of this character. The word "mine" ordinarily conveys to the intelligence the idea of a large opening into the ground into which men descend for the purpose of getting metal, ores, or coal, and large enough to accommodate such operations. This is the ordinary meaning of the word and the sense in which it is employed in the Constitution. Now, if an oil well be not a mine—and it most assuredly is not—then the drilling or operation of such a well could not possibly be termed a "mining operation." A productive oil well or aggregation of them is always universally and invariably known as an "oil field." Who ever heard of such being called a "mine"? If an oil well was a "mine" in the usual signification of the word, surely sometime, somewhere, some intelligent person would be heard to designate it by that term; but it is never done. Now a "mining operation" must certainly be something having to do with a mine, and, if an oil well is never

known in the ordinary and customary use of language as a "mine," then neither the making nor operating of one would possibly be considered a mining operation in the ordinary signification of the word. He who works in a mine is termed a "miner"; but no one ever heard of a laborer at an oil well being called a "miner." It is shown by the testimony that an oil well is too small for a man to get into, even if such was necessary or desirable, which it is not. We think it absolutely clear that the words "mine," or "mining operation," never refer to oil wells or oil production in ordinary parlance. But, even if there should be any doubt upon that point, it must be resolved against the plaintiff, because they are claiming an exemption under the Constitution, and it must be construed strictly, and, unless they show themselves clearly entitled to this exemption, they must lose. It seems to us self-evident that the intention of the Constitutional Convention in framing article 230 was to hold out to capital an inducement to open and work mines in the state, not for the sake of having them opened, but to give employment to thousands of laborers who would become a permanent addition to our population and who would be home builders and an incalculable benefit to the state. It is evident that they had in contemplation mines in the true sense of the word; that is, mines of coal, iron ore, and such, which are, to a large extent, permanent in their nature, and which would afford directly employment to large numbers of people. They did not have in mind oil wells and oil fields, which are temporary and evanescent in their nature; there is nothing permanent about them. It is evident that, if they had actually had oil fields in mind in framing the provisions of article 230, such would not have been brought within the exemption for the simple reason they afford employment to comparatively very few; they are but little benefit to the state. The owners resist every raise made in the assessment of their property, and, if that does not avail, they seek to cloak themselves with article 230. The business is of such temporary character that by the time an increase can be made in the assessment property has begun to wane in value. Notwithstanding the enormous quantities of oil produced at the oil field in question, not enough population has been gathered there to make even an incorporated village; there are no works of permanent improvement found there; and, since the production has greatly decreased, it is a dreary place, and in a few more years will be a worthless one. Contrast this locality with Birmingham, Pittsburg, and places where there are mines in the proper and usual meaning of the term. It is shown in the testimony that, although the plaintiff's production of oil was at times as high as 29,000 barrels per month, they actually failed to prove that as many as five hands were continuously employed by them. And this brings us to the consideration of another point in the case.

BREAUX, C. J. Our associate, Justice NICHOLLS, prepared the foregoing opinion. As he is unable to be present, he sent it to us from his room of illness and suffering, for consideration.

It was adopted by all the members of the court.

In the last sentence reference is made to another point, and the writer stopped.

We are decidedly of the opinion that the "Guffey Petroleum Company" is not engaged in mining operations, and that the operations do not come within the terms of the article of the Constitution exempting such operations from taxation.

Boring for oil is not a "mining operation." Nor is the gushing process nor the pumping up of oil "mining."

"Mining" has been defined as a process by which useful minerals are extracted from the earth. This does not include the process

whereby petroleum oil is obtained—not a mineral within the intendment of the cited article of the Constitution.

Further, in regard to mining, it may be said that the art of mining consists of processes whereby ores or other minerals are obtained from the earth—minerals known as solids. They existed in the early dates in liquid or gaseous state—but now they are solids.

Mineral waters are not classed as minerals; in fact, no absolute line of demarcation can be drawn between ordinary and mineral water.

Nor is mineral oil a mineral within the intendment of the article of the Constitution invoked by plaintiff. Oil does not have the physical properties of minerals which can be extracted by mining.

Beyond general expressions upon the subject, we have not found a single decision in which it was decided that the process of obtaining petroleum oil from the earth is a mining operation.

Has the J. M. Guffey Petroleum Company not been properly assessed, is the question presenting the next issue for decision. In our opinion the assessment is now valid.

It was assessed as the Guffey Oil Company. Being the same company (the Guffey Petroleum and the Guffey Oil Company), the decisions which hold that property must be assessed in the name of the record owner are not in point. They are cited by plaintiff. They do not support the company's contention. Here the only question is whether there was error in the name of the owner to the extent that it vitiated an assessment. We conclude the record owner is the J. M. Guffey Petroleum Company.

It is sufficiently described by the name of "Guffey Oil Company."

Since the year 1907, the assessment has been made in the name of the Guffey Oil Company. No complaint has been made before this suit was brought. It is too late now to complain of the insufficiency of the name. The plaintiff knew of this assessment —doubtless paid other taxes in that name.

The testimony does not show that plaintiff employed a number of men over five. There may be proof of the employment of that number. If there is, it has not been found.

It may be lurking somewhere on one of the pages of the voluminous record. We hold that the employment of five hands is essential to exemption.

Having arrived at the conclusion that the plaintiff is not exempt, that relieves us from the necessity of deciding other points than those decided.

For reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from is avoided, annulled, and reversed at the costs of plaintiff in injunction in both courts. The injunction is dissolved.

It is further ordered, adjudged, and decreed that the property assessed is subject to taxation, and that its owners owe the amount of the claim made by defendant in injunction.

On Application for Rehearing.

LAND, J. We may concede the contention of the learned counsel for the plaintiff that, scientifically speaking, petroleum is a "mineral," and that its extraction from the bowels of the earth is a "mining operation." But petroleum is a substance of a peculiar character, and differs in many respects from coal and other minerals which have a fixed situs. Petroleum also requires an entirely different process of mining, so called. As late as 1897 it was deemed necessary to pass an Act of Congress to class petroleum as a mineral in the sense of the mining laws of the United States. Act Feb. 11, 1897, c. 216, 29 Stat. 526; section 2333, Rev. St. (U. S. Comp. St. 1901, p. 1434).

In 1898 no oil or gas wells existed in the state of Louisiana, and it was not until 1910 that oil and gas were classed with "other minerals." Acts No. 172 and 196 of 1910.

The Civil Code refers to "mines and quarries" as worked or opened, and not opened, and as the subjects of usufruct and of lease. Articles 552, 2738.

The term "mining operations," as used in the Constitution of 1898, if taken in its most general sense, may be construed to include all operations to obtain anything from the earth which is not animal or vegetable, such as water gases, and mineral oils.

But in its ordinary acceptation the verb "mine" means to "dig" in the earth to get ore, metals, coal, or precious stones, and the noun "mine" means a pit or excavation in the earth, from which metallic ores, precious stones, or other minerals substances are taken by digging; distinguished from the pits from which stones for architectural purposes are taken, and which are called "quarries." Webster's International Dictionary, verb. The question before us is whether the term "mining operations" was used by the framers of the Constitution of 1898 as a most general classification of things, or in its most usual signification. One of the canons for the construction of laws is thus expressed in Civ. Code, art. 14:

"The words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words."

The same canon is also expressed in article 1946 of the Civil Code:

"The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use."

Another rule of construction is that exemptions from taxation are strictly construed, and doubt as to the legislative intent is fatal to the claim of immunity.

The claim of exemption urged by the plaintiff is at least doubtful, and for that reason must be denied.

Rehearing refused.