16 Cal.2d 714 (1940)
THE PEOPLE, Respondent,
v.
GAIL BRADFORD SILVER, Appellant.
Crim. No. 4312. 
Supreme Court of California. In Bank. 
December 18, 1940.
 Henry Brouillette and Raymond E. Hodge for Appellant.
 Earl Warren, Attorney-General, and Bayard Rhone, Deputy Attorney-General, for Respondent.
 CARTER, J.
 Defendant herein was charged by information with the crime of murder. After a plea of not guilty, he was tried before a jury which returned a verdict of guilty *716 of manslaughter. This appeal is prosecuted from the judgment of conviction, from an order denying a motion for new trial, and from an order denying a hearing on defendant's application for probation.
 There is little controversy as to the facts. They may be summarized briefly as follows: Defendant, aged 22, was a son-in-law of a Mrs. Shook, who was the owner of a mining claim operated under the name of Temescal Clay Company; said claim being located near Victorville, San Bernardino County. The mine consisted of two open cuts in the side of a mountain from which silica was taken. Above the open cuts and adjacent thereto and upon the Temescal Clay Company property was situated, among other things, a gasoline storage tank of 640 gallons capacity, with an unenclosed gasoline pump located out in the open near a road, a short distance from an enclosed blacksmith shop and oil house. The gasoline stored therein was for use in and about the operation of the claim. Prior to the night of November 24, 1938, gasoline had been stolen from the tank. On the 24th and 25th days of November, 1939, defendant was employed and stationed as a watchman on that property. On the night of November 25, 1939, at about 6 P. M. defendant placed himself at a point near the top of a hill at an approximate elevation of 84 feet above the point where the gasoline pump was located and a distance of approximately 288 feet in a direct line from the pump. Shortly after dark, in the moonlight, he observed an automobile being driven to and about the property without lights. He picked up a 30-30 Winchester rifle and then saw the outline of the car backed up to the gasoline pump. He testified that after waiting a short time he called out "What do you want?"; that after receiving no answer he called "If you don't get out I will shoot"; that he fired a shot to scare away the thieves who were stealing gasoline out of the tank; that he waited a few moments and called again and then he fired two more shots; that after firing the second shot he heard what he thought sounded like a rock falling, as though someone was coming up the hill toward him, and that he then fired another shot and ran back over the hill approximately a mile and a quarter to a trailer house and endeavored unsuccessfully to have a man go back and assist him at the scene where the men were stealing the gasoline; that he then got in his car, went to Victorville, *717 called the office of the deputy sheriff at Barstow, and went to the home of Joseph Simonic, after which a doctor administered him morphine to quiet his nerves. After midnight he was taken to the scene of the shooting by the deputy sheriff and others and he claimed that it was then that he first learned that Lee Hartman, the deceased, had been shot and that he, together with his two younger brothers, Walter and Ernest, were the ones who had driven to the mining property for the purpose of stealing gasoline. The evidence indicates that the three brothers had been there on other occasions for the same purpose.
 Their testimony, in substance, shows that on the night in question, they arrived on the property in their automobile, turned out the lights, and backed up the hill to the gasoline pump. All three boys got out of the car. Although the pump was locked, by some manipulation they were able to fill the tank of the car. While Lee and Ernest were draining the hose a shot was fired from the hill. Lee was struck by a bullet through the chest, fell backward and apparently died immediately. The same shot entered the leg of the youngest boy. The boys all claimed that prior to the first shot no words of warning were given by defendant. Ernest then started up the hill toward defendant and shouted "Stop shooting, mister!" He claims that he then heard a voice that said "Get the Hell out of there or I will shoot you" or "If you don't get out I will fill you all full of lead." A second shot followed, while Ernest was trying to put Lee in the back seat of the car. He testified that he again called to defendant and said "Don't shoot any more ... one of my brothers is shot." He claimed defendant said, "I told you guys to get out." After the second shot he discovered that his other brother, Walter, had been shot through the leg. Before they left for their home a third shot was fired over the car. Lee was taken to the mortuary and Walter received medical aid at the hospital. The charge of murder followed.
 On this appeal defendant claims (1) that the verdict is contrary to the law and the evidence; (2) that the court misdirected the jury in matters of law and erred in decisions of law arising during the course of the trial; (3) that the court erred in denying defendant's motion for a new trial; and (4) that the court erred in denying a hearing on an application of defendant for probation. *718
 As his sole ground of defense defendant contended that the homicide of which he was admittedly guilty was justifiable. The portions of section 197 of the Penal Code relied upon are: "Homicide is ... justifiable ... 1. When resisting any attempt ... to commit a felony ... or, 2. When committed in defense of habitation, property, or person against one who manifestly intends or endeavors by violence, or surprise, to commit a felony, ..." It is defendant's position that the Hartmans, who, according to their own testimony entered upon the property which defendant was guarding, with intent to and from which they did steal gasoline, were guilty of the felony of burglary. In this connection reference is made to the code definition of burglary (Penal Code, sec. 459), namely, "Every person who enters any ... mine, or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary." (Emphasis ours.)
 Defendant maintains that the jury were improperly instructed with respect to this defense. Certain instructions offered by him were refused. They are as follows:
 "You are instructed that every person who enters any mine, or any underground portion thereof, with intent to commit grand or petit larceny, or any felony, is guilty of burglary, a felony"; and
 "You are instructed that the California legal definition of a mine includes all mineral-bearing properties of whatever kind or character, whether underground, quarry, pit, well, spring or other source from which any mineral substance may be obtained;"
 "And you are further instructed that the California legal definition of 'mineral' includes all mineral products both metallic and non-metallic, solid, liquid or gaseous, and mineral waters of whatever kind or character." (Citing sec. 2200, Code of Public Resources; Webster's Dictionary; Smith v. Cooley, 65 Cal. 46 [2 P. 880].) And
 "You are instructed that sluice-boxes, flumes, hose, pipe, railway tracks, cars, blacksmith-shops, mills, and all other machinery or tools used in working or developing a mine are to be deemed affixed to the mine." (Citing Civ. Code, sec. 661 [now sec. 2601, Public Resources Code].)
 Certain instructions given by the trial court were objected to by the defendant. The trial court read section 197 of *719 the Penal Code on the question of justifiable homicide, and section 195 of said Code on excusable homicide, and instructed the jury in the language of section 459 of said Code defining burglary, as follows:
 "You are instructed that every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, railroad car, mine, or any underground portion thereof, with intent to commit grand or petit larceny or any felony, is guilty of burglary"; and then added, "In this connection you are instructed that the word 'mine' in a specific sense means 'a subterranean cavity or passage, especially a pit or excavation in the earth, from which metallic ores or other mineral substances are taken by digging.' "
 This was followed by a further instruction:
 "... that one charged with homicide cannot avail himself of the defense that the homicide he stands charged with was justifiable because it was committed in defense of property in his charge or care unless it be shown that before the fatal shot was fired by the defendant it must have appeared to him, as a reasonable person, that the deceased manifestly intended or endeavored by violence or surprise to commit a felony."
 It is defendant's contention that the definition of the word "mine" given in the second paragraph of this instruction on burglary is entirely too restricted; that from the wording of section 459 of the Penal Code the legislature intended a mine to be not only the underground portion thereof, but also that portion of the mine above the ground and the equipment thereon used in the operation of the mining plant, and that in reading the given instruction as a whole, and particularly by joining the two distinct instructions or definitions with the words "in this connection", there was but one conclusion that the jury could reach, and "that was that the court instructed them that a mine is a hole in the ground from which mineral is dug, and that a person entering a mine is guilty of burglary, but that it did not apply in the instant case because, from all of the testimony the decedent and his two brothers did not enter a hole in the ground with the intent to commit grand or petit larceny". Defendant claims that the legislature did not intend the use of the word "mine", in the definition of burglary, in a specific sense, and that the *720 term "mine" included the whole claim or body of mining property, citing Tredinnick v. Red Cloud etc. Min. Co., 72 Cal. 78, 81 [13 P. 152]; 40 Cor. Jur., pp. 733-735 (par. 3, sub-par. 3); and (par. 8, sub-par. 6.)
 The prosecution in reply maintains that the property in question was a quarry and not a mine citing Marvel v. Merritt, 116 U.S. 11 [6 S.Ct. 207, 29 L.Ed. 550]; J. M. Guffey Petroleum Co. v. Murrel, 127 La. 466 [53 So. 705]; Hoysradt v. Delaware L. & W. R. Co., 151 Fed. 321, 331; Board of Commrs. of Greene Co. v. Lattas Creek Coal Co., 179 Ind. 212 [96 N.E. 633, 637, 100 N.E. 561]; and that even if it could be considered a mine within the meaning of the statute, there was no structure whatever on the premises that the Hartman brothers sought or attempted to break into or enter. It is pointed out that the gasoline pump itself was entirely out in the open and was not covered with any roof or sides.
 The prosecution further points out that section 459 of the Penal Code defining burglary was amended in 1913 (Stats. 1913, p. 228), by adding "mine, or any underground portion thereof" to the structures which were subject to burglary. It is contended that driving upon a naked claim (upon which no structures have been erected, although entitled to be called a mine) with intent to commit a theft, could not under any theory of the law be held to be a burglary; that the statute, as amended, really contemplates that a person must enter a "home ... mine, or any underground portion thereof" before he could be guilty of burglary.
 [1, 2] We agree with the contention of the defendant that the definition of a mine given to the jury by the trial court was entirely too restricted, and that the instructions offered by defendant on this subject should have been given. Silica, the substance taken from the mine here in question, is a mineral, and the place where it is discovered and removed from the earth is a mine regardless of the method of its extraction--whether it is done through open cuts in the surface or subterranean tunnels.
 The prosecution maintains that the doctrine of ejusdem generis should be applied in defining the use of the words "mine, or any underground portion thereof". In our opinion, if that were the case, the legislature might well have omitted the word "mine" as it is used standing alone, and *721 added only the words "any underground portion of a mine", for the structure and other outbuildings of a mine would have been included in the other portions of the statute. [3] It is to be remembered that "the doctrine of ejusdem generis is but a rule of construction to aid in ascertaining the meaning of the legislature, and may be used to carry out, but not to defeat the legislative intent." (23 Cal.Jur. 756.) [4] A rule of construction which appears to be more consonant with the legislative intent in this case is that "a statute will be given its full effect, as far as possible, and will be so construed that the whole may stand, and that each part thereof may have the meaning and effect which, from the act as a whole, appears to have been intended." (23 Cal.Jur. 757.)
 [5] There are many reasons for believing that the legislature intended by the addition of the words "mine, or any underground portion thereof" to Penal Code, section 459, to make the entering of the surface of mining property with the intent to commit grand or petit larceny or any felony thereon burglary. One reason is undoubtedly the fact that much of the equipment used in the operation of a mine and mine plant of necessity must be left out of doors unenclosed by four walls and a roof. The greater portion of such equipment such as hose, pipes, flumes, compressors, railway tracks and other tools from the nature of their use and because of their bulk cannot be kept in enclosed buildings. Another reason is that mining property is most frequently located in areas of relative isolation somewhat apart from thick settlements of population and the security of police protection. These circumstances obviously render such property susceptible of appropriation by those who are inclined to steal or misappropriate the property of others where the likelihood of their apprehension is slight or the penalty for their conduct is mild. It is probable, therefore, that the legislature, by the addition of the word "mine" to the statute had in mind the imposing of this rather severe penalty to act as a deterrent to those who might be inclined to take advantage of the isolation of mining claims, especially in the absence of the owners thereof or of adequate police protection, to enter and appropriate property which may lay there in the open necessarily unenclosed.
 [6, 7] Defendant also objects to instructions given on the subject of self-defense. One of the instructions so complained *722 of reads: "The court further instructs the jury that to justify the killing of another in self-defense, it must appear to the defendant as a reasonable person that the danger was so urgent and pressing that in order to save his own life, or to prevent receiving a great bodily harm, the killing of the other was absolutely necessary." Defendant's objection to this instruction lies in the fact that at no time did he raise as a defense to this action the argument of self-defense. It is his position that the interposition of the instruction confused or misled the jury in rendering its verdict.
 We are of the opinion that the instructions were erroneously given. When the charge to the jury, though a correct statement of legal principles, is extended beyond such limitations so as to cover an assumed issue which finds no support in the evidence it constitutes error. (People v. Savinovich, 59 Cal.App. 240, 244 [210 P. 526].)
 The defendant contends that the instructions on self-defense concerned a vital feature of his defense, and placed upon him a greater burden of proof than that exacted by the law; that said instructions, coupled with the confusion which must have been created in the minds of the jurors as to what his real defense was, operated to prevent the jury from adequately comprehending and correctly considering the only defense interposed by him--that of justifiable homicide.
 This contention of the defendant finds support in the case of People v. Roe, 189 Cal. 548, p. 559 [209 P. 560], wherein the court said, "That the several instructions upon the law of self-defense, given to the Jury at the request of the People, were calculated to confuse the Jury and must have prejudiced the defendant's case, is affirmatively shown, we think by the fact that they charged the Jury that 'in order to justify a killing upon the ground of self-defense, it must have appeared to the slayer, as a reasonable person, that the danger, if any, was so urgent and pressing that in order to save his own life, or prevent his receiving great bodily harm, the killing was absolutely necessary ...; that the killing was done under a well founded belief that it was necessary for the defendant to kill the deceased at the time to save himself from great bodily harm ...; that the slayer had really and in good faith endeavored to decline further trouble before the fatal shot was fired.' ... and if the Jury applied, as doubtless they did, the requirements of said instruction *723 to the situation of 'the slayer' at the time of the killing, they could not fail to find, in the face of the undisputed fact that she was not being assailed by the deceased at the time of the killing, that it was not necessary for her to kill the deceased to save herself from death or great bodily harm, and, therefore, in keeping with the charge of the court the Jury had no alternative but to find the defendant guilty upon the fictitious issue of self-defense, which was, by the instruction complained of, created and injected into the case in conflict with and to the confusion of the defense of the person of another, which was the only defense interposed and relied upon by the defendant, and which, under the evidence bearing upon the situation of the defendant at the time of the killing, was the only defense available to her."
 [8] Where errors in instructions occur, the question always arises as to whether or not they are prejudicial. Here it may be said that where the proof of a defendant's guilt is clear, and no extenuating circumstances appear, such errors may not be prejudicial. But where a case, such as the one at bar, is what may be termed a "close" case, and where the erroneous instructions concern matters vital to the defense of the defendant, and may have resulted in a miscarriage of justice, we are of the opinion that such errors must be regarded as prejudicial and should result in a new trial for the defendant.
 [9] Upon a new trial the question will again arise as to whether certain testimony offered by the defendant should have been rejected. On the night before the date of the homicide, after defendant had spent most of the night on the hill as watchman, he went to the Union Oil Station at Victorville to get warm. While there he met a deputy sheriff of San Bernardino County and had a conversation with him in which he sought and received the advice of said deputy sheriff with regard to his rights and duties as a watchman. The court refused to permit the defendant to relate the conversation had with the deputy sheriff immediately prior to the homicide, on the ground that it was immaterial and self-serving, and defendant contends that the conversation was a part of the res gestae, and that he was entitled to introduce said conversation because it would bear not only on the intent of the defendant, but also on the question of his negligence. *724
 In the case of People v. Fong Sing, 38 Cal.App. 253, 258 [175 P. 911], the District Court of Appeal gave consideration to the instances in which evidence of this character might be received on behalf of a defendant in a criminal case.
 It is true that in said case the evidence offered was held inadmissible for the reason that there was no utterance by the defendant himself. Defendant had offered to show that one Gong Sue had requested another, Charlie Suey, to go to a lumberyard, as evidence that he, the defendant, accompanied Charlie Suey to said lumberyard. The court correctly ruled such evidence inadmissible, saying, "The rule contemplates some utterance by the party to the action himself and not that of a third party for the very obvious reason that the declaration is admissible only because it is supposed to be expressive of what is in the declarant's own mind with respect to the intention as to his destination, which, manifestly, could not be determined from what some other person might have said, unconnected with any declaration in that particular by the party himself. ..."
 In the instant case, however, defendant offered to relate a conversation in which he sought to ascertain his rights and duties as a watchman. The fact that he conscientiously attempted to learn and act within his rights could be construed as negativing the existence of an intent on the part of defendant to negligently and recklessly shoot at anyone unlawfully on the property which he was guarding. Then again the defendant might have been warned by said deputy sheriff that certain dangerous criminals were at large in the vicinity who might be stealing gasoline and that he should be exceedingly careful for his own safety. Of course, such knowledge would not give defendant the right wilfully or recklessly to shoot at anyone unlawfully on the premises. Nevertheless, the defendant was justified in acting on appearances, and if the information which he received from the deputy sheriff was such as to create in the defendant a state of mind which would cause him as a reasonable man to believe that it was advisable for him to shoot when he ascertained that a burglary or robbery was being perpetrated, the jury were entitled to take this evidence into consideration in determining whether or not the defendant fired the fatal shot without exercising the caution or circumspection which a reasonably prudent person would have exercised under the circumstances. *725
 That such evidence is admissible was determined in the case of People v. Fong Sing, supra, wherein, at page 258, the court said:
 "There are many cases which have sanctioned testimony of extrajudicial declarations where a defendant in a criminal case or a party to a civil action has made some statement as to some matter arising in connection with a transaction constituting the principal fact in dispute. Declarations in such cases, however, have generally been admitted, not altogether under the rule of res gestae, or because they were deemed as strictly a part of the principal transaction in dispute, but because they were regarded as indicative of the frame of mind of the declarant as to some act growing out of the principal transaction, and exhibited under such circumstances or conditions as to make it reasonably certain that it was not the result of a premeditated design to prepare, pro re nata, a statement of the fact; and it is generally upon this latter theory, rather than upon the theory that it is a part of the transaction in dispute, that the declaration of a person as to his destination on leaving his home or some other place is receivable as evidence of his intention or purpose where such declaration has a material bearing upon his connection or want of connection with the principal question in issue."
 If the conversation did bear on the defendant's intent or negligence we are of the opinion the trial court should have permitted it to be related. The purported conversation was not too remote, it having occurred at 3 o'clock on the morning of November 25, 1939, on which date, at 6 P. M. the homicide occurred. Of course, we are here passing on the offer of proof only, and if upon presentation of the evidence, it does not in fact have some bearing upon defendant's intention or negligence at the time of the occurrence of the homicide, the power of the trial court may be invoked to strike the same from the record.
 The judgment and order denying defendant's motion for a new trial are and each of them is hereby reversed, and the cause is remanded for a new trial in accordance with the views expressed herein.
 Houser, J., Curtis, J., Shenk, J., and Traynor, J., concurred.