[Crim. No. 162.   Second Appellate District.—December 1, 1910.]

# THE PEOPLE, Respondent, v. WILLIS ERNSTING, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT — CLOSE CASE — ERROR DEEMED PREJUDICIAL.—Although there is evidence tending to support the verdict of guilty of murder in the second degree, yet the case is such a close one, that if the jury had acquitted the defendant, it could not be said with assurance that such a verdict was not in accordance with the evidence, or that there had been a miscarriage of justice. In such a close case, any error in the reception or exclusion of evidence must be deemed prejudicial.

ID.—EVIDENCE — STOPPAGE OF GARBAGE TEAM OVER BODY—STATEMENTS OF BYSTANDER TO DRIVER—DEFENDANT NOT IDENTIFIED—PREJUDICIAL ERROR.—Where on a dark night a garbage team of three animals stopped over the body of deceased, who died shortly afterward, with his ribs crushed in, whereupon the driver descended and removed the body out of the way, and asked a bystander who approached, whose features he could not recognize, where an officer could be found, evidence of statements made by him in reply showing a harsh demeanor, and a brutal and unfeeling disposition, and unwillingness that an officer should be called, was prejudicially erroneous, where the only evidence of identification of defendant as such bystander at the trial was that he was "about the build, just the build." This was not sufficient evidence of identification upon which to permit such proof.

ID.—IMPEACHMENT OF WITNESS — CONTRADICTORY STATEMENT AT PRELIMINARY EXAMINATION—PROOF NOT IN RECORD.—It cannot be said that the testimony of a witness was successfully impeached by evidence of a contrary statement at the preliminary examination, where such evidence is referred to but not incorporated in the record upon appeal, so that it can be considered upon appeal.

ID.—IMPROPER EVIDENCE OF MEDICAL EXPERT.—Where a question is asked of a medical expert which was not clear or intelligible, and the answer to which would involve the assumption of many different conditions, and also called for an opinion upon a matter not properly within the scope of expert testimony, the admission of an answer in reply thereto was erroneous.

ID.—ARGUMENT OF DISTRICT ATTORNEY — MISAPPLIED INFERENCE FROM EVIDENCE—PREJUDICE NOT SHOWN—INSTRUCTION.—An argument of the district attorney based upon an inference from evidence misapplied by mistake was not prejudicial, where the court properly instructed the jury that inferences which they were entitled to make from the evidence must be founded on a fact legally proved.

ID.—ABSENCE OF ERROR IN INSTRUCTIONS.—It is held that the instructions given covered sufficiently all matters upon which the defendant asked instructions, and fully and correctly stated the law to the jury.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Frank R. Willis, Judge.

The facts are stated in the opinion of the court.

W. H. Dehm, and Earl Rogers, for Appellant.

U. S. Webb, Attorney General, and George Beebe, Deputy Attorney General, for Respondent.

JAMES, J.—Defendant was charged by an information of the district attorney with having, on or about the fifteenth day of August, 1909, in Los Angeles city, murdered one William Salter. The jury by their verdict found him guilty of that crime and of the second degree thereof. He was sentenced to serve a term of twenty years' imprisonment. An appeal having been taken from the judgment, and from an order denying defendant's motion for a new trial, the record of the proceedings had in the superior court is brought here for review. Insufficiency of the evidence to sustain the verdict and judgment, and errors claimed to have been committed by the trial court in admitting and refusing to admit testimony, and in giving and refusing to give to the jury certain instructions, are the grounds upon which a reversal of the judgment and order is sought.

William Salter at the time of his death was a man about seventy years of age, in good health, well preserved physically and very active. He weighed nearly two hundred pounds. On the fifteenth day of August, 1909, he resided at a lodging-house at 618½ South Spring street, in Los Angeles city. Near by, about one-half a block from the intersection of Spring and Sixth streets, a saloon known as "The Gordon Bar" was located. This bar was situated in the block bounded by Main and Spring streets on the east and west and Fifth and Sixth streets on the north and south, respectively. An alley running midway between Main and Spring streets from Fifth to Sixth streets divided the block into two sections

and furnished a passageway wide enough for teams to travel on between the streets last mentioned. This alleyway was paved down its central portion with rough cobble stones. At No. 515½ South Main street was located the lodging-house where defendant resided. This lodging-house was kept by Mrs. Margaret E. Osgood, and it had a rear entrance which led from the alley referred to, through a brick archway, to a flight of stairs. As near as can be gathered from the record, the rear entrance to this lodging-house was distant at least one hundred and fifty feet from the intersection of the alley with Sixth street.

Salter was addicted to the use of intoxicants to excess, and on the fifteenth day of August had been drinking heavily. He appeared at the Gordon bar at about 10:30 or 11 o'clock that night so much intoxicated that he was refused more liquor by the barkeeper on that account. At that time defendant was conversing with a friend named Bob Marquis near the end of the bar counter. Salter, whom defendant had not been acquainted with theretofore, approached the latter and placed his arm about defendant and attempted to embrace him affectionately. Salter used terms of endearment toward Ernsting and finally attempted to fondle him in a lewd manner, at the same time making by words a proposal that Ernsting permit the commission of a disgusting and degenerate act for the gratification of Salter. Ernsting repulsed the intoxicated man and treated the matter lightly. The acts of Salter in embracing Ernsting were observed by Gordon, the proprietor of the bar, and Bob Marquis, who had met defendant by appointment at that place. No further attention was paid to the men by Gordon, Marquis, or the barkeeper. Marquis left the place at about 11:30 P. M. and at that time Ernsting and Salter were still there. No witness testified to having noticed the two men leave the place. Up to this point in the narrative given at the trial there is no conflict of evidence. When next seen together on that night both Salter and Ernsting were in the lodging-house at 515½ South Main street, where Ernsting resided. Mrs. Osgood, the landlady, testified that about 1 o'clock in the morning she heard the noise of a heavy fall and opened the door to see what caused the disturbance. She saw defendant and Salter on the floor, defendant being on top of Salter and in the act of arising;

defendant helped Salter up and took him down the stairway
at the rear of the house leading to the alley heretofore re-
ferred to; Salter kept saying, ''Don't, don't,'' and resisted
the efforts of Ernsting to take him down; at the foot of the
stairs both men fell to their knees and Ernsting arose, and
as Mrs. Osgood believed, carried Salter out through the rear
archway into the alley. Another witness, a woman lodger,
testified that the men appeared to walk from the foot of the
stairs into the alleyway. Ernsting was of the age of forty-
one years, and physically about the same size and weight as
Salter. He was afflicted, however, with a hernia or rupture,
which interfered with his ability to do heavy work. Mrs. Os-
good testified that after Ernsting and Salter disappeared
through the archway into the alley, Ernsting had returned in
about twenty minutes and went to his room. Between 1 and
1:30 o'clock of the same night a garbage gatherer was driving
through the alley. He was driving three animals hitched
abreast—a horse on either side with a mule between them.
It was quite dark in the alleyway, but a lantern hung on the
left side of the wagon at the front threw some little light
between and ahead of the animals hitched to the wagon. At
a point about sixty feet from the intersection of the alley with
Sixth street the animals pulling the garbage wagon suddenly
came to a standstill. The driver saw some dark object in
front of their feet at the left and threw on his brake. He
then got down and found the body of a man lying close to
the front feet of the team. He pulled it out of the way. The
body proved to be that of William Salter, who was then in a
dying condition. As was developed at the post-mortem exami-
nation, Salter's breast bone and all of the ribs on either side
of it had been broken in; the ends of the broken ribs had
penetrated the liver, causing a great hemorrhage from which
death resulted. Salter never spoke after being found by the
garbage gatherer; he made no sound at all except to groan a
few times, and he died before he could be removed. About
five dollars in silver coins were found by the officers in the
pockets of Salter when the body was searched.

The defendant when arrested made several conflicting state-
ments as to when he had last seen Salter on the night of Au-
gust 15th, but finally admitted and testified at the trial that
he had seen him at the lodging-house at 515½ South Main

street and had taken the man down the back stairs. He testified that he had disengaged himself from Salter at the saloon and had gone to his room; that upon leaving his room to get some water a short while afterward he found Salter in the hallway; that the latter again embraced him and wanted him to consent to the consummation of the lewd act before suggested by Salter; that Salter gave him fifteen dollars; that he refused to consent to the desire of Salter and took the man down the rear stairs, telling him he must go away; that in his struggle with Salter to force the latter to leave the house the two had fallen down at the head of the stairs; that after getting Salter down to the alley he proceeded with him south to Sixth street, and that Salter there went on his way toward Spring street, he (Ernsting) calling at the saloon for a package and then returning to his room.

The contention was made at the trial on behalf of defendant that the injury received by Salter must have been caused by the team of the garbage gatherer. Ernsting was not guilty of the crime of murder if the injuries which caused Salter's death were accidentally produced at the time the two men fell together in the hallway of the lodging-house, under the circumstances testified to by defendant; for if defendant's statement that he was followed by Salter from the saloon to the lodging-house was true, then defendant would have had the right to cause Salter to leave the house, using all necessary force to accomplish that purpose. On the other hand, if the jury believed, as they must have, that defendant took Salter to his room and robbed him of money and that in the accomplishment of that act he, either intentionally or otherwise, injured him so that his death resulted, the verdict was right. It was for the jury to consider the facts and circumstances and weigh them, and their determination cannot be disturbed on the ground alone that there was no evidence warranting the conclusion reached, for there was evidence to sustain it.

In considering the alleged errors of the court in the admission or rejection of testimony, or in the giving or refusing to give instructions to the jury, examination of those questions is approached with the consideration in mind that the charge against defendant is a most serious one, and the punishment visited upon him necessarily of great severity. Further, that the evidence upon which he was convicted presents

a case where, had the jury decided in his favor, it could not be said with assurance that such a verdict was not in accordance with the evidence, or that there had been thereby a miscarriage of justice. In a "close case," such as the one under consideration, it must be assumed that the jury weighed every small fact and circumstance, and if the court erred in admitting or rejecting proof of any such, the error will be deemed prejudicial. Very differently will the same questions be viewed in cases where the proof is plain and abundant of a defendant's guilt.

1. The court erred to the prejudice of defendant in admitting the testimony of witness S. F. White as to statements made by a bystander at the time the body of Salter was found in the alley. This witness did not pretend to have known defendant at that time. He saw a man there who apparently came in through the alley from Sixth street, but because of the darkness he had no opportunity to observe the man's face. White testified that when he inquired of the man where an officer could be found the person addressed replied: "What the hell do you want to call an officer for? It makes no difference if he is drunk; an officer is the last one you want to call. What are you doing here, anyway? Are you a damned hobo?" White testified that he told the man that he was driving the garbage wagon and that the man then said, "Oh!" and turned and walked out of the alley. The only testimony as to any similarity of appearance between this man whom White saw and held the conversation with and the defendant was the following given by White: "Q. How did he correspond in appearance with defendant? A. About the build, just the build."

This was not sufficient evidence of identification (and there was none other) upon which to permit proof of the statements made by the bystander. The evident purpose of the testimony was to show that the defendant was present at the body of Salter at that time; that he was harsh of demeanor as indicating a brutal and unfeeling disposition, and that he desired to avoid the coming there of police officers. The admission of this testimony was prejudicial to defendant. The same observations may be made of the admission of the statements of witness Gomez, who told of a conversation had by

him with an unknown man in the alley while the body of Salter was lying there.

2. Willard F. Smith, a police officer, testified that he found no marks on the clothing on the front of the body of Salter; that the vest was white and that he examined it with the aid of a flashlight and saw no marks or dirt thereon. Defendant's counsel proceeded to show the witness a transcript of his testimony as given at the preliminary examination of Ernsting, and asked him if he did not testify as shown by that transcript. An objection made to the question by the district attorney was sustained. If the testimony given by the witness at the preliminary examination was contradictory of his then testimony, it was proper for that fact to be shown, but nowhere in the record presented does it appear just what the testimony offered to be proved was. Counsel for defendant, upon being halted by the objection and ruling of the court, said: "Your honor, to have it shown in the record that we offer to show the transcript of the preliminary examination, commencing at line 27, on page 148, and running to and including line 4 of page 149, offer that in order to impeach the witness to show that he has testified different at another time." There was an objection by the district attorney to the offer and the objection was sustained. There the matter was allowed to rest. Counsel sets out the testimony given by Smith at the preliminary examination in his brief, but it was not made a part of the record of the trial in any way that entitles this court to consider it.

3. Dr. George W. Campbell, a witness, was asked by the district attorney this question: "Q. A small object inflicted the same kind of a wound it would be more likely to leave an impression on the outside of the skin than a large object?" This question, which was answered by the witness in the affirmative, was not clear in the form it was put, but the evident intent was to ask whether a small instrument implanted with force against a human body would leave more surface markings than a larger one implanted in the same way. The question was not intelligible and an answer to it necessarily would involve the assumption of many different conditions. Besides being incompetent because of this fact, it called for an opinion upon a matter not properly within the scope of

expert testimony. The admission of the answer was, therefore, error.

4. Complaint is made of certain statements of the district attorney used in his argument to the jury. C. A. Jones, a police officer, testified that when he went to arrest the defendant he did not disclose the true charge upon which he was making the arrest, but told defendant at that time, when asked for a reason, that "there had been some little holler made about his living there." In his argument to the jury the district attorney said, referring to the defendant: "At the time he was arrested the neighbors complained about him living there. What sort of a man is this, that the neighbors should be complaining about his living there?" Defendant's counsel objected to the statement that the neighbors had complained, and the district attorney retorted that he was drawing an inference from the testimony. It is true there was no evidence proving or tending to prove, that the neighbors had complained of the residence of Ernsting at the place where he lived when arrested. He was not then living at the lodging-house of Mrs. Osgood, but in a district remote from that locality. While the statement was not warranted by the testimony, it does not appear that defendant was prejudiced by it, for the district attorney told the jury that he was presenting it as an inference only, and with the testimony before them the jury could determine whether such an inference was well founded or not. Furthermore, the court at the conclusion of the trial instructed the jury that inferences which they were entitled to draw must be founded upon a fact legally proved.

The instructions given by the trial judge covered sufficiently all matters upon which defendant asked further instructions to be given. The law applicable to the case was fully and, in our opinion, correctly stated in the charge to the jury.

Because of the rulings made at the trial in the admission of testimony which, for the reasons given, constituted prejudicial error, the judgment and order are reversed and a new trial ordered.

Allen, P. J., and Shaw, J., concurred.