[Crim. No. 4864.   In Bank.   Nov. 1, 1948.]

THE PEOPLE, Respondent, v. REBEL B. CORNETT, Appellant.

Edward M. Raskin, under appointment by the Supreme Court, for Appellant.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant was charged with the murder of Fred Weaver Cole, the stepfather of his divorced wife. A jury found him guilty of murder in the first degree and made no recommendation as to penalty. The trial court denied his motion for a new trial and sentenced him to death. This is an automatic appeal from the judgment imposing the death penalty. (Pen. Code, § 1239 (b).)

The circumstances of the homicide, according to the testimony of the witnesses for the prosecution, were: At the time of the homicide defendant, a pipe yard worker, was living with his divorced wife, Pauline Cornett, and their eight children in a one-room cabin in a labor camp at Woodlake, California. On September 28, 1947, defendant was seeking employment for his children in the cotton fields and had returned to the cabin at 3 o'clock in the afternoon. Mrs. Cornett was then preparing dinner; several of the children were in the cabin, while the others were outside. After defendant entered the cabin an argument immediately took place between him and Mrs. Cornett. She accused him of drinking, and he cursed her repeatedly; he repeated that he was "going to get" her and the "entire bunch" including the decedent. Shortly after, she left the room to avoid him and went into the lavatory. Finally she went out of the house and concealed herself behind buildings near by so that he would not be able to find her. Meanwhile, defendant secured a Japanese Luger from his bed and placed it under his shirt; after uttering words to the effect that he was going to get drunk, he left the cabin and drove away in his automobile. Thereafter a neighbor took Mrs. Cornett and seven of her children to the home of the decedent in Exeter. Upon their arrival Mrs. Cornett related to

the decedent what had occurred at the cabin at Woodlake, whereupon the decedent secured two pistols and placed them under his shirt. She and the children went into the house, while he waited on the front porch. A short time later defendant arrived in his automobile. By this time all the children except Virginia, aged 15, had gone upstairs; Virginia and Mrs. Cornett remained in the front room in order to observe through the window the two men outside. After talking to the decedent for a few moments, defendant approached the front door and said, "Come on out, Mom, you are in trouble." Mrs. Cornett then rushed out of the front room and departed from the house through the rear door. She entered the house of a neighbor, where she remained until she heard a shot coming from the upstairs room of the decedent's house. As both defendant and decedent entered the house, Virginia ran upstairs.

Defendant proceeded up the stairs, and the decedent followed several steps behind. Neither defendant nor the decedent held a gun in his hands as he ascended. At this time Virginia was sitting on the window sill behind a dresser, which was located near the head of the stairs; Letta, aged 13, was standing at the head of the stairway, while James, aged 10, was behind a sewing machine; the younger children were playing on the floor. When the men arrived at the head of the stairs defendant said to the decedent, "You better draw, this is your last draw." As they entered the room defendant asked him if he knew where Mrs. Cornett had gone, and he replied that he didn't know. Thereupon defendant looked behind a dressing screen, apparently seeking Mrs. Cornett, and then removing his gun from his shirt, whirled around and shot the decedent, who at that time was standing sideways to him about five feet away. The decedent caught himself on a chair. Defendant then said, "I am going to Visalia and give up"; the decedent said, "I will go with you." Defendant replied, "No, you are not," and approaching the decedent very closely fired a second shot into his stomach. This time the decedent fell to the floor. After removing the decedent's two guns from his shirt, defendant went downstairs and placed one of the decedent's guns in the front room. Taking the other two guns with him, he drove away in his automobile.

Defendant was apprehended a short time later in Woodlake by Chief of Police Borgman and Police Officer Bolen of Exeter, who testified as follows: After Chief Borgman had called at the residence of the decedent to investigate the

shooting, he and Officer Bolen immediately proceeded to Wood-lake, where they were joined by the chief of police of Wood-lake. They proceeded to defendant's cabin but found no one there. As they were about to leave, however, they saw defendant's car approaching and awaited his arrival. As defendant stepped out of his car, the three officers pointed their guns at him and ordered him repeatedly to drop his gun. Defendant at first ignored their orders, but finally dropped the gun on the third command. The officers immediately searched him and found the Luger under his shirt. As they were taking defendant to Visalia he asked, "How is he?" Chief Borman replied, "He was still alive when we left town, but he has probably passed away now." Defendant then said, "Good, I have been wanting to do this for a long time."

The circumstances of the killing according to the testimony of defendant were: On the morning of September 28, after placing his Luger in his shirt, he left the cabin at 11:20 to seek employment for his children. After he had returned in the afternoon, Mrs. Cornett began to accuse him of drinking, but he told her that he had not been drinking. He was not angry; he warned her, however, that if she continued to accuse him he would go to town to obtain a drink. He departed shortly thereafter and drove up and down the main street of Woodlake. He returned about 15 minutes later and learned that a neighbor had taken Mrs. Cornett and the children to the home of the decedent. He thereupon went to the home of the decedent and found him waiting on the front porch. The decedent greeted him and asked him if he wanted to come into the house. The defendant replied that his purpose in coming was merely to get the children, and that he wanted to hurry back to Woodlake, since it was getting late in the evening. As he approached the door the decedent said, "Wait," and looking back defendant saw that the decedent had drawn a gun and was pointing it at him. Defendant remonstrated with him and told him to put the gun away. Then he dashed back toward him and said, "Don't do that, Fred." The decedent thrust his left arm forth, and defendant seized it. The decedent said, "I am going to kill you," but defendant argued with him as he held his left arm and kept down the other hand in which the decedent held his gun.

At this stage of his testimony defendant testified: "When I kept on arguing with him to put the gun down—I said, 'Get it off me. You don't want to kill me. I didn't come here for any trouble.' He said, 'Well, you've got a gun.' I said, 'That's

right; I've got a gun, but I've got it buttoned up, not out like yours.' He said, 'Well, go on in,' and raised the gun back on me. And I walked sideways, but I didn't get out of his reach through the door. Then we had another argument. I kept asking him to take it off and he kept telling me five or six times he was going to kill me.''

They finally entered the front room and proceeded upstairs with defendant leading the way. As the decedent followed, he held his gun in his hand but did not point it directly at defendant. Both men continued to swear and argue. Letta was near the head of the stairway looking down at them as they ascended. When they neared the head of the stairs, Letta ran down, stating that she would call the police; the decedent replied that he would take care of his own job, and that he didn't require any policemen. After they had entered the upstairs room, the decedent raised his gun toward the hips of defendant and stated, ''You better make your draw. This is your last chance.''

Defendant testified that at that particular time only he, the decedent, and two small children, aged 3 and 4, were in the room; and that the two children were playing on the floor. His testimony continues: ''I stepped about three steps to the foot of that bed and I looked back and he was coming on me with his gun like that. . . . As he come that way on me I turned my head on the right. I wheeled right quick and made my draw and as I run into him I struck at him and hit his right arm and that kept him sideways and his gun fell out of his hand on the floor. And the kids was in between us and I jumped back and snapped a shot and fired again as he went down.'' The shots ''weren't over a second. They just followed one another.''

After the decedent fell defendant placed his foot against his shoulder and pushed him over in order to see his face and said, ''Fred, you made me shoot you.'' The decedent didn't answer. He picked up the decedent's gun so that the small children would not harm themselves and went downstairs. Taking the two guns with him he left the house and went to Woodlake.

Defendant denied that he had made a statement at his cabin either to Mrs. Cornett or to his children about shooting the decedent. He further denied that he had stated to the decedent to make his last draw, but testified that the decedent himself had made such a statement to him. He also testified that when he was approached by the officers at Woodlake he

dropped his gun immediately upon the first command; he denied that he had made an admission to the police officers that he had been wanting to kill the decedent for a long time.

Defendant contends that the trial court committed error in giving the following instruction on self-defense by including therein the words "absolutely necessary": "The court instructs the jury that the mere apprehension of danger is insufficient to justify an assault with a deadly weapon. The fear if any must have been produced by circumstances such as would be sufficient to excite the fears of a reasonable person. The law of self-defense is founded on necessity, and in order to justify the taking of life upon this ground it must not only appear to the person using the deadly weapon, as a reasonable man, that he had reason to believe, and did believe, that he was in danger of his life, or of receiving great bodily harm, but it must also appear to his comprehension, as a reasonable man, that to avoid such danger, it was *absolutely necessary* for him to use the deadly weapon on the other party. . . . The court further instructs the jury that to justify the assault with a deadly weapon of another in self-defense, it must appear to the person using the deadly weapon, as a reasonable person, that the danger, if any, was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm, the assault with the deadly weapon of the other was *absolutely necessary*. . . ." [Italics added.] The use of the term "absolutely necessary" in such instructions has been condemned, since it might have the effect of misleading jurors to believe that the right of self-defense can be asserted only if the act of killing was actually necessary. (*People* v. *Carmichael*, 198 Cal. 534, 549 [246 P. 62].) Preceding the word "absolutely," however, the instruction indicates that "it must . . . appear to his comprehension, as a reasonable man, that to avoid danger" it was necessary for the defendant to take the life of another. Although the instruction when considered in its entirety shows that the taking of life depends upon reasonable appearance to the defendant (*People* v. *Holt*, 25 Cal.2d 59, 64 [153 P.2d 21]; *People* v. *Acosta*, 21 Cal.App.2d 57, 61 [68 P.2d 298]), such an instruction should not be used because it might indicate to the jury that the right to self-defense is available only where the killing is absolutely necessary to save life.

The trial court erred in failing to give an instruction that the jury should have viewed with caution the oral admissions of defendant. Section 2061(4) of the Code of Civil

Procedure provides that a jury is "to be instructed on all proper occasions; that the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of a party with caution." It is clear that in view of the foregoing code section the trial court should have given such a cautionary instruction. (*People* v. *Koenig,* 29 Cal.2d 87, 94 [173 P.2d 1]; see *People* v. *Thomas,* 25 Cal.2d 880, 891 [156 P.2d 7].)

The trial court also erred in giving the following instruction: "There must be an intent to kill, but there need be, however, no appreciable space of time between the forming of the intent to kill and the overt act—they may be as instantaneous as successive thoughts of the mind. A man may do a thing wilfully, deliberately and intentionally from a moment's reflection as well as after pondering over the subject for a month or a year. He can premeditate, that is, think before doing the act, the moment he conceives the purpose, as well as if the act was the result of long preconcert or preparation." As held in *People* v. *Bender,* 27 Cal.2d 164, 182 [163 P.2d 8], and *People* v. *Valentine,* 28 Cal.2d 121, 134 [169 P.2d 1], such a combination of instructions is wholly erroneous. "Of course the instruction that there need be 'no appreciable space of time between the intention to kill and the act of killing . . .' is abstractly a correct statement of the law. It will be properly understood (at least upon *deliberation*) by those learned in the law as referring only to the interval between the fully formulated intent and its execution, *and as necessarily presupposing that true deliberation and premeditation characterized the process of, and preceded ultimate, formulation of such intent* . . . But holding that such declaration is a correct statement of the abstract principle of law is not a holding that the same declaration made to a jury without explanation is not error. Particularly is it misleading when read in the context in which it was used. It excludes from the required showing any deliberation and premeditation between the intent and the act of killing and since other portions of the instructions eliminate any necessity for deliberation or premeditation in forming the intent ('He can premeditate . . . the moment he conceives the purpose . . .,' etc.), we find that the court has wholly deleted the only difference, in this type of case, between first and second degree murder." (*People* v. *Bender, supra,* 27 Cal.2d 164, 182-183.) To say that the defendant "can premeditate . . . the moment he conceives the purpose" pre-

cludes the meaning of careful thought and the weighing of considerations embodied in the ordinary dictionary meaning of "deliberation" and "premeditation." (*People* v. *Thomas, supra,* 25 Cal.2d 880, 898; *People* v. *Bender,* 27 Cal.2d 164, 183 [163 P.2d 8].)

█ The trial court, however, gave other instructions relating to the meaning of "deliberation and premeditation" essential for murder in the first degree: "The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death." Although the foregoing instruction states the proper meaning of the deliberation and premeditation required to establish the offense of murder in the first degree, it did not cure the error, but instead created a serious conflict in the instructions. Where it is impossible to determine which of inconsistent instructions were followed by the jury, conflicting instructions have been held to constitute reversible error. (*People* v. *Dail,* 22 Cal.2d 642, 653 [140 P.2d 828]; *Wells* v. *Lloyd,* 21 Cal.2d 452, 458 [132 P.2d 471].) It cannot reasonably be said that the jury, even though given the proper instruction, was not misled by the further instruction that "a man may do a thing . . . deliberately and intentionally from a moment's reflection. . . . He can premeditate, that is, think before doing the act, the moment he conceives the purpose. . . ." The jury could find defendant guilty of murder in the first degree only by finding that the murder was the result of deliberation and premeditation, since the killing did not take place during the commission of the felonies enumerated in section 189 of the Penal Code. The evidence is without conflict that defendant fired at the decedent after whirling around from a position in which he was looking behind a bed or screen. The jury could have

found defendant guilty of murder in the first degree on the basis of either of the following findings: (1) Following the correct instruction it may have found that the defendant had formed an intent to kill after carefully weighing and considering the question of killing, or that the killing may have even been deliberated before his arrival at the home of the decedent; (2) it may have found that defendant entered the upstairs room without previously considering the question of shooting the decedent but that he conceived the thought "upon a moment's reflection" as he whirled around. In view of the evidence it is impossible to determine, therefore, whether or not the jury reached its verdict on the basis of the correct instructions. Clearly the evidence under proper instructions would have supported a verdict of murder in the first degree; it is also clear, however, that it is reasonably probable that the jury, if it was properly and unambiguously instructed, could find defendant guilty of murder of lesser degree, since it could have concluded that he shot the decedent as the result of a sudden impulse engendered by an argument that had taken place between the two men, or by defendant's fear of his own life caused by the tense relationship between them at that time.

The trial court committed an even more serious error by instructing the jury in the language of Penal Code section 1105 that "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justifiable or excusable." (*People* v. *Thomas, supra,* 25 Cal.2d 880, 895.) This section does not set forth a rule relating to the burden of proof, but merely declares a rule of procedure that imposes on the defendant only a duty of going forward with the evidence of mitigating circumstances. (See 9 So.Cal.L.Rev., 405, 409.) It was held in several early cases that the defendant under this section has the burden of proving mitigating circumstances by a preponderance of the evidence. (*People* v. *Hong Ah Duck,* 61 Cal. 387, 396; *People* v. *Raten,* 63 Cal. 421, 422; *People* v. *Arnold,* 15 Cal. 476.) It is now established, however, that the defendant is not required to prove mitigating circumstances by a preponderance of the evidence, but need only introduce evidence of such circumstances to raise a reasonable doubt of his guilt. (*People* v.

*Bushton,* 80 Cal. 160, 164 [22 P. 127, 549]; *People* v. *Elliott,* 80 Cal. 296, 305 [22 P. 207]; *People* v. *Post,* 208 Cal. 433, 438 [281 P. 618]; *People* v. *Wells,* 10 Cal.2d 610, 622 [76 P.2d 493].) "The reading of section 1105 to the jurors without explaining to them the extent of the burden cast upon defendant would tend to create in their minds the impression that the obligation cast upon defendant was much greater than the obligation cast upon him as defined by the late decisions of the Supreme Court. Since an erroneous view of section 1105 was taken by the justices in the Hong Ah Duck and other cases it cannot be successfully argued that the jurors, without the aid of an explanatory instruction, could differentiate between the view expressed in the early California cases and the view expressed in the later cases and accurately determine the extent of the obligation cast upon defendant." (*People* v. *Carson,* 43 Cal.App.2d 40, 44-45 [110 P.2d 98].) Thus, a jury may construe "the burden of proving circumstances of mitigation" as imposing upon the defendant the burden of persuasion on this particular issue, and may believe that mitigating circumstances do not exist unless the defendant proves the existence of such circumstances by a preponderance of the evidence or by some other degree of proof.

██ Moreover, the instruction is erroneous in that the jury was not fully advised that such an instruction has no application in determining the degree of murder, and that it is applicable only in determining whether the homicide constitutes murder or manslaughter, or is justifiable or excusable. (*People* v. *Thomas, supra,* 25 Cal.2d 880, 897; *People* v. *Valentine, supra,* 28 Cal.2d 121, 133.) The expression "circumstances of mitigation" is capable of an interpretation by a jury to include any circumstance that tends to reduce the crime from murder in the first degree. Such an instruction therefore, while having no application in the determination of the degrees of murder, may have the effect of indicating to the jury that a burden is imposed upon the defendant (if the evidence shows murder in the first degree) of showing mitigating circumstances to prove murder in the second degree. It may have the effect of foreclosing any consideration by the jury that mitigating circumstances, although not sufficient in law to justify or excuse the homicide, may be enough to reduce the crime to second degree murder by counteracting the element of premeditation or deliberation. Thus, a conscientious jury, misled by the instruction, may believe that if the defendant does not satisfy the burden of persuasion relat-

ing to mitigating circumstances, it no longer has to consider such circumstances in its deliberations. Furthermore, ''logic suggests that since such section in reality merely declares a rule of procedure and does not relieve the state of the burden of proving each and every essential element of guilt beyond a reasonable doubt the propriety of reading it to the jury, even with a proper explanation, is doubtful.'' (*People* v. *Thomas, supra,* 25 Cal.2d 880, 896.)

█ It may be contended that this instruction, though erroneous, could not have prejudiced defendant. Such an instruction may not be prejudicial, if the jury is adequately instructed in connection with instructions relating to mitigating circumstances, that the prosecution has the burden throughout the entire trial to prove every element of the crime beyond a reasonable doubt, and that the burden of persuasion never shifts to the defendant. (See *People* v. *Leddy,* 95 Cal.App. 659, 672 [273 P. 110]; *People* v. *Richards,* 1 Cal.App. 566, 572 [82 P. 691]; *People* v. *Hawes,* 98 Cal. 648, 653 [33 P. 791].) Although the trial court gave the usual instructions relating to the presumptions of innocence and the burden of the prosecution to prove every element of the crime beyond a reasonable doubt, such instructions did not render the erroneous instruction harmless. Since these instructions were not given in connection with the instructions relating to the mitigating circumstances, they did not clarify the confusion likely to result from the reading of section 1105. The jury might have concluded that an instruction based on the language of section 1105, which was given in conjunction with the general instructions on self-defense, created an exception to the rule that to be entitled to an acquittal the defendant must only create a reasonable doubt in the minds of the jurors. (*People* v. *Marshall,* 112 Cal. 422, 425-426 [44 P. 718].)

Since defendant admitted the killing and claimed that the shooting was done in self-defense, the giving of the erroneous instruction appears particularly prejudicial. (*People* v. *Roe,* 189 Cal. 548, 565 [209 P. 560]; *People* v. *Marshall, supra,* 112 Cal. 422, 425; *People* v. *Post, supra,* 208 Cal. 433, 438-439.) Defendant was entitled to have the jury in resolving the conflict in the evidence apply to his testimony the rule as to reasonable doubt. The jury following an erroneous view of defendant's burden may have believed that after the prosecution had completed its case the burden shifted upon defendant to prove that the homicide was excusable. Accordingly,

it may have concluded that defendant by his testimony failed to sustain the burden of persuasion on this issue. That testimony, however, even though not enough in the minds of the jurors to prove self-defense, might have been sufficient to raise a reasonable doubt in their minds. Since defendant was required by the erroneous instruction to produce more evidence than the law demands to establish his defense, he was in effect deprived of the force of his testimony. Thus, it cannot reasonably be said that it is improbable that the jury would have reached a different result had they been properly instructed that defendant was required only to raise a reasonable doubt on the issue of self-defense. Such an instruction therefore may have misled the jury on a matter vital to the defense of defendant. (See *People* v. *Silver,* 16 Cal.2d 714, 723 [108 P.2d 4] ; *People* v. *Dail, supra,* 22 Cal.2d 642, 659.)

After a consideration of the entire record it is clear that the giving of this erroneous instruction, particularly when considered with the other erroneous instructions, has resulted in a miscarriage of justice.

The judgment and the order denying the motion for new trial are reversed.

Gibson, C. J., Carter, J., Schauer, J., and Spence, J., concurred.