THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ARCADIO TÚA CINTRÓN, Defendant and Appellant.

No. 16451. Decided November 27, 1961.

*José Rafael Gelpí, Celedonio Medina Lozada,* and *Benjamín Ortiz* for appellant. *J. B. Fernández Badillo, Secretary of Justice, Arturo Estrella, Assistant Secretary of Justice, Alfredo Archilla Guenard, Prosecuting Attorney of the Supreme Court,* and *William Fred Santiago, Assistant Prosecuting Attorney of the Supreme Court,* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Santana Becerra and Mr. Justice Blanco Lugo.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Appellant assigns 15 errors against the judgment of murder in the first degree rendered against him in this case. Before discussing them, we will examine the evidence appearing in the record on the essential facts of this death.

The first witness for The People testified that on July 28, 1956, the very day of the events, appellant went to his drugstore between 4:00 and 5:00 p.m. to buy something for the nerves, and that he sold him 20 tablets of bromural in a small drugstore envelope which he identified. Appellant took one tablet in the drugstore. He told the witness that he was nervous, that he had spent the evening in the wake of Lic. Nelson Colberg.

Luis Marty Rivera testified that while he was in a political meeting the Sunday prior to the day of the death—Saturday, July 28, 1956—the victim, Loreto Rivera, called appellant Túa a thief, that he had stolen his land because he had moved the fence of his boundaries. They were about to engage in a fight, but it was prevented. On Friday, the day before the events, Túa asked the declarant to be his witness, that he was going to sue Loreto Rivera for calling him a thief, but the witness refused. Túa then said to him: "If you don't want to be my witness, I'll kill him like a dog," referring to the victim. The witness informed that to Rivera, and the latter said he would not even kill a chicken.

Casto Ramírez testified that about 8:00 p.m. of July 28, 1956, he saw the victim coming, that the latter stopped for a while in front of a show window of the establishment of A. Sanabria to look at the merchandise, and that from the porch of his house, at a distance of 35 to 40 feet, he heard 5 or 6 shots in succession, and saw a person standing, whom he could not recognize, firing to the ground and saw the flashes in a downward direction. He did not see anything on the ground because of the darkness and the distance, and he saw

the man but could not tell who he was. The light was out in the lamp post and he could only see the figure of a man, standing, and who was firing downward. He said that he did not hear any words or provocation prior to the shots.

Miguel Ángel Camacho testified that about 8:00 p.m. of July 28 the victim, Loreto Rivera, was walking along the front of A. Sanabria and saw Túa on the rear of the establishment. As Rivera rounded the corner, Túa was squatting behind a garbage drum about three feet high, and he came out from behind the garbage drum and fired the first shot at Rivera, at a distance of some eight feet. The victim fell to the ground at this shot. Túa fired five other shots while Rivera was on the ground, at a distance of three to four feet. The victim fell at the first shot. The place was dark. On cross-examination this witness said that he was drunk, that he had been drinking beer; he then said he was "high". The first time he went by he saw the appellant standing; the second time when he went around the store he saw him behind the drum. He said that the victim was carrying a small bottle of beer in his right hand. This witness was riding a bicycle along the place of the occurrence.

Apolonio Irizarry testified that that evening, between 8:15 and 8:30 o'clock, when he reached the street of A. Sanabria, he saw Túa and Loreto Rivera on the rear, and that as he approached them a shot was fired immediately followed by another. Rivera fell to the ground. Túa was beside a drum and Rivera in front of him, facing each other and the drum between them. He heard only two shots and Túa ran away when the victim collapsed. This witness was also riding a bicycle. The first shot was fired at a distance of about eight feet and the second at six feet. The place was quite dark.

Police lieutenant Marcos A. Vega said that when he arrived at the scene of the crime he searched the body of Loreto Rivera and found money and some papers. He found

a bottle of India beer near the head of the victim and a bullet which was imbedded in the wall of A. Sanabria. In the morning of July 30 he found in the yard of a house situated in the rear of A. Sanabria a 38-caliber revolver from which six cartridges had been discharged and which had been registered in appellant's name since 1948.

In addition to the foregoing facts, there was medical evidence on the autopsy. Also, that eight days before his death the victim had sent word to the appellant that he wanted to be his friend despite the strip of land appellant had taken away from him, because when he died he could not take it with him to the grave; that shortly before his death Rivera had a shave in the barber shop and his spirits were as usual, chatting with the barber; that the following day the victim was celebrating a baptism in his house, and that after the shots Túa fled and was wearing glasses which he took off, and carrying a coat in the hand which he threw under a vehicle, and that the small envelope with the tablets was found in his pocket. The evidence for the defense was the following: Eulogio Seda testified that the victim was walking along A. Sanabria with a bottle in his hand, and that when he rounded the corner he noticed that he did "this" with the bottle and said, "take this, you thief," raising the right hand with the bottle. Thereupon Túa fired some quick shots. Túa was walking along and both were facing each other. It was semidark. When Loreto uttered those words and raised the hand, he was about 20 or 25 feet away from Túa.

Policeman Matías Álvarez stated that at a meeting held on Saturday or Sunday of July 1956, he heard the victim say aloud to the appellant, "you are a thief, you stole a piece of land from me," and that Túa walked over to some policemen and did not know whether they intervened with Rivera.

Tomás Montalvo related that that day he and Rivera were going to the burial of Lic. Colberg, and that when Túa,

who was also in the burial, went past them, Rivera said, "look at that thief who removed my landmarks. That one moved over the landmarks, but I'll fix that up." That he would not get away with murder, that he was going to kill him; that he would settle that because as soon as he came across him he would kill him. The witness realized that Túa heard that. Later he asked the appellant what had happened to him with Rivera that he was so indignant, and the latter said that Loreto was talking foolishly. The witness warned him to be very careful, that the consequences would be bad.

The appellant testified in self-defense. After recounting the problems and incidents encountered with the victim regarding the boundaries since 1952, he said that at the meeting held eight days prior thereto Rivera grabbed him by the arm and said: "You are a thief, I am going to shoot you." He went to the police and they apprehended Rivera. The day of the events he spent the night in the wake of Lic. Colberg, he was drowsy as a result of the lack of sleep, and asked the druggist for the tablets. In the burial he heard what Rivera said to Montalvo, and stated that the latter had told him about the whole conversation and that he was one hundred per cent in danger. That night he was coming from his house to fetch his wife; he was carrying a revolver because Rivera had threatened him several times and he believed that his life was one hundred per cent in danger. As soon as Rivera saw him at a distance of 18 or 20 feet, he said to him: "Take this, you thief," and he saw a shiny weapon in Rivera's hands which he could not tell what it was. The victim made a movement or gesture as if to throw the shiny weapon at him, and the appellant "lunged" for his revolver and fired several shots at him in succession, like lightning. They were about 18 to 20 feet apart. As soon as the victim turned around, appellant ran away fearing the deceased's sons who were bold and went around armed. He put the revolver over the belt and it was covered by the coat which he carried

on his right arm. The last witness for the defense and of the trial was Dr. Minsky. We will refer shortly to his testimony. Those are the essential facts appearing from the record.

The first three errors are to the effect that the trial court erred (1) in not permitting Dr. Minsky to testify or give his opinion on the manner in which the wounds were inflicted, as to the possible course of the bullets and the position of the victim's body after receiving the bullets, because the judge erroneously believed that a medical expert can not testify on those particulars; (2) that the judge instructed the jury that the opinions of witness Dr. Minsky were wholly speculative; and (3) that the judge put some questions to Dr. Minsky which conveyed to the jury his opinion on the possible credibility of that witness and on the efficacy and value of his testimony, thereby invading the jury's functions.

■ The first error was not committed. Dr. Minsky testified and answered all the particulars on which the defense wished him to testify, despite the fact that the testimony was clearly incompetent and inadmissible. Regarding the other two errors, the record shows that the certificate of the autopsy referred to six bullet wounds which were described in the course of the evidence for the prosecution by the physician who performed the autopsy, Dr. Jutzy, with its orifices of entry and exit, their course in the victim's body and the internal organs affected. Dr. Jutzy explained that he had numbered those wounds from one to six for convenience in following the course of his findings. The defense called Dr. Minsky to the witness stand for the purpose of asking him hypothetical questions. In view of the report of the autopsy with which the witness was already acquainted, the defense asked the doctor to describe to the jury the position of the body when it received the impact of those bullets. The witness said that if they wished a description as to how the wounds were inflicted, it would be better to illustrate on the

attorney's body the entry and exit of the bullets and he would thus be able to show *"how the wounds were inflicted."* The judge asked whether that would not be speculative and the witness answered that he doubted it..., that it could be speculative, but that they would attempt to prove that it was very probable. The district attorney asked him whether he would then assume which was the first wound inflicted on the victim, and when the witness said that the first was on the hand the district attorney made objection alleging that the doctor had no basis on which to determine which was the first bullet wound which the deceased received, arguing that he would have to assume the first, then the second and the rest, and that that was speculative because the bodies could move. Upon the defense insisting that that was why he brought the expert, to determine which was the first bullet that entered the body, whether in the front or whether there was some inclination, the judge said that that was not a case of medical expertise and it was wholly speculative, depending on the circumstances under which the impacts were received and the position of the body, and that that had nothing to do with medical expertise. The judge sustained the district attorney's objection. Request was not made to withdraw the jury while the same was being discussed.

Despite the fact that the objection was, in our opinion, correctly sustained, upon examination by the defense the witness gave the testimony objected to:

"...I can not say whether this was the first bullet, but anyway in its course it entered here by the left side near the fourth rib and came out here; *then* the body received the *second* bullet which came out through the nipple; it then *turned over* and received the *next* bullet here, at ten centimeters from the spinal column. This bullet pierced the pancreas, the stomach, the diaphragm, and the pericardium, and came out below the right nipple; the *other* entered here, on the right side of the spinal column, and came out below the navel, *the body being completely turned over, more than in the previous one.* The *last* one entered

below the scapula and came out here. In my opinion, this body received a number of bullets in succession as *it moved over* and fell. This is what I can say on the basis of the autopsy report."

In testifying that if the shots had been fired while the body was on the ground the person who fired them could not have been in a fixed position in front of the body but would have had to change "permanently" his position as he continued to fire: "Hon. Judge: Q.—And if the body moved on the ground as he continued to fire? A.—It could be, but according to the course in the body, in this direction, that indicates clearly a movement, Your Honor... It could be. Q.—The same as if he were standing by the side and the person who has the weapon fires from the side. It all depends on the standing position and the surface which receives the impact of the bullet. A.—Correct, quite correct, Your Honor... Anyway, if you see it in this course, which as I said may be speculative, this is still more probable according to the different courses and the manner in which it occurred." In stating his opinion that it was doubtful whether the victim received the wounds on the ground, the judge asked him whether in order to reach that conclusion as to the manner in which in his opinion this man received the shots he had used his knowledge of medicine, and whether any other person not having medical knowledge could have made the same conclusion. The witness said he could not reach it without knowledge of anatomy, and agreed with the judge that it was a question of making an analysis of the course of the bullet according to the position of the body. The doctor further testified in a hypothetical way on the different courses in firing at a person lying on the ground, from different positions, concluding that they depended on the movement of the body and on the position of the revolver.

■■ In view of the foregoing, the second and third errors were not committed either. In *People* v. *Bartolomei*, 70 P.R.R. 664, and later in *People* v. *Díaz*, 74 P.R.R. 348,

we stated amply the rules governing an impartial and fair trial which should be observed by the presiding magistrate as respects his intervention in general, the making of remarks, questions to the witnesses, the conveyance to the jury of his opinion on the credit which the latter deserve, or attempting to controvert their credibility, or their opinion as to the guilt; in sum, any conduct on his part which may cloud the impartial conscience of the proceeding of which he is a symbol and should represent, and which betrays him as favoring the interests of either of the parties. See, also, *People* v. *Sanjurjo*, 73 P.R.R. 526; *cf. People* v. *Matos*, 81 P.R.R. 496, 503–04; *Valentín* v. *Warden*, 80 P.R.R. 450, 468; *People* v. *Martínez* (judgment), 79 P.R.R. 552, dissenting opinion of Mr. Justice Belaval with whom the present Chief Justice joined, pp. 558–60. Those rules, which will never cease to be sufficiently ponderable, nor sufficiently remembered, were not altered in this case. The testimony was an expert testimony fundamentally hypothetical and speculative and without rational basis, clearly incompetent and inadmissible, which parted from a false premise. From the mere course of the bullets in the body and the knowledge of the orifices of entry and exit, which was the only evidence before him, the witness could not reasonably establish the sequence or order of the wounds nor the position or movements of the victim as he received them. This was not a medical expert testimony properly speaking, or concerning something on which the jury could not form their own opinion without the aid of an expert. *People* v. *Smith*, 29 Pac. 64, 93 Cal. 445; *People* v. *Milner*, 54 Pac. 833; *People* v. *Hill*, 48 Pac. 711; *People* v. *Fossetti*, 95 Pac. 384; *People* v. *Salaz*, 225 Pac. 777; *Crawford* v. *State*, 78 So. 2d 291 (Ala.) ; *Cobb* v. *State*, 83 So. 2d 833 (Miss.) ; *People* v. *Ernsting*, 112 Pac. 913; *People* v. *Overacker*, 115 Pac. 756. The cases of *State* v. *Powell*, 78 S.E.2d 248, and *State* v. *Stanley*, 44 S.E.2d 196, in the light of the facts therein, do not support a different principle.

■ The judge's intervention under those circumstances, in an attempt to prevent as far as possible, by making explanations, that an unreasonable and incompetent testimony should confuse the jury, was not improper even if to that effect he made remarks on this type of evidence. The credibility of certain evidence which was intrinsically lacking credibility, and which the appellant had no right to have the same go to the jury, could not be affected. *Cf. People* v. *Harris*, 198 P.2d 60, 65.

The fourth assignment alleges that the trial court erred in instructing that the law requires that malice aforethought must be presumed. The sixth assignment alleges that it erred in saying to the jury that the burden of proof devolves upon the defendant to show lack of malice, for the purpose of reducing the offense to manslaughter.

Regarding the former, the instruction specifically given was the following: "The law says that malice aforethought must be presumed, and if there is malice aforethought, such case, such act, is one of murder. Naturally, murder in some other lesser degree." Thus stated, the instruction would not be wholly correct, or at least wholly complete. Section 199 of the Penal Code (1937 ed.)—33 L.P.R.A. § 631—defines murder as the unlawful killing of a human being with malice aforethought.[1] According to the following § 200— § 632— "such malice" [2] may be express or implied, and it is express when "there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature." [3] It is *implied* when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. On the other hand, § 247 of the Code of Criminal Procedure (1935 ed.)—34 L.P.R.A. § 726—provides that in a trial for murder, *the commission of the homicide by the de-*

---

[1] In Spanish *"con premeditación."*

[2] In Spanish *"dicha premeditación."*

[3] In Spanish *"se manifiesta 'el propósito deliberado' de quitar la vida ilegalmente a un semejante."*

50

*fendant being proved*, the burden of proving circumstances of mitigation, or that excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to *manslaughter* or that the defendant was justifiable * or excusable.[4]

 Where it is established that a defendant has perpetrated the unlawful killing, there can be no legal presumption that he acted with malice aforethought and committed murder until he shows on the contrary that it was

---

* The Spanish version of the 1935 edition through error used "jurisdicción" and it so appears in L.P.R.A.

[4] Section 247 was taken from California. Penal Code, § 1105. In California it has been said that that section, taken jointly with our §§ 199 to 201 of the Penal Code, has the effect of making every killing murder by law unless the defendant proves the contrary. *People* v. *Todd*, 317 P.2d 40, 154 Cal. App. 2d 601; *People* v. *Wells*, 76 P.2d 493, 10 Cal.2d 610. In this latter case it was said that when the homicide by the defendant has been established, without further showing, the legal presumption is that it was malicious and an act of murder, but in such case the verdict should be murder in the *second* degree and not murder in the first degree. That case cites *People* v. *Jones*, 117 Pac. 176, 160 Cal. 358, to the effect that malice is essential to murder, but under § 1105 (§ 247), when the homicide by the defendant has been proved, the murder is established, thereby creating a peculiar situation of law touching murder that proof of the homicide establishes the crime, with its ingredient of malice, and the burden is transferred to the defendant of proving circumstances to lessen the offense or justification, and that thus the effect of this section and § 199, construed together, is as though the law has expressly declared that, while murder is the killing with malice aforethought, every killing is murder unless the defendant proves the contrary.

However, even though there are some other decisions in line with the foregoing, in some of which it is held that the defendant is also bound to show preponderantly such elements of mitigation or excuse, California has unequivocally and predominantly held that that section only establishes a rule of procedure which does not relieve the State of proving beyond a reasonable doubt the guilt as well as the essential elements of murder; does not impose on the defendant the burden of proving preponderantly such defenses, since that would deprive him of the benefit of reasonable doubt; nor does it impose on him the burden of persuasion, nor change at any stage the burden of proof, but that the defendant merely goes forward with the evidence of mitigating elements, and that he is only bound to produce such evidence to raise a reasonable doubt as to his guilt. *People* v. *Hardy*, 198 P.2d 865; *People* v. *Valentine*, 169 P.2d 1; *People* v. *Deluney*, 264 P.2d 532; *People* v. *Cornett*, 198 P.2d 877; *People* v. *Carson*, 110 P.2d 98; *People* v. *Goldstein*, 99 P.2d 1069; *People* v. *Powell*, 25 Pac.

manslaughter, or that it was justifiable. Such interpretation of § 247 does not apply in this jurisdiction, particularly after the statutory presumption of innocence of § 236 of the Code of Criminal Procedure—34 L.P.R.A. § 715—[5] was constitutionally sanctioned. In view of the constitutional provision, it ought to be clear that according to § 247 the defendant is presumed to be innocent as to every essential element of the offense and the burden of proof does not change at any stage of the proceeding. He would only be bound to introduce such evidence as will establish a reasonable doubt on his guilt. For a conviction for murder, The People must establish beyond a reasonable doubt not only that defendant perpetrated the killing but also with malice aforethought, and that the fact alone of the death does not favor the State with the presumption of law which releases it from proving all the essential elements of the crime of murder. Malice aforethought is an element *of fact* to be determined by the jury, but it being a mental or subjective ingredient, where the deliberate intention of unlawfully taking the life is not manifested, the jury is free to infer or deduce the same as a fact from the other acts or circumstances surrounding the perpetration of the death or connected therewith, after being instructed in pursuance of law that malice denotes a wrongful and intentional act, *without just cause or excuse*, to the prejudice of another. The People is bound, however, to produce those facts and

---

481; *People* v. *Bushton*, 22 Pac. 127. It has also been held that this provision does not apply to the *degrees* of murder, only if the killing is murder or manslaughter, or is excusable or justifiable. *People* v. *Cornett*, *supra*. Some have held that an instruction should not be given on the terms of § 247 *supra*, unless its meaning is adequately explained to the jury. *People* v. *Guldbrandsen*, 218 P.2d 977; *People* v. *Tuthill*, 187 P.2d 16; *People* v. *Lindley*, 161 P.2d 227; *People* v. *Thomas*, 156 P.2d 7. See, also, *Stokes* v. *People*, 23 N.Y.Supp. 167; *People* v. *Sandgren*, 98 N.E.2d 460; *People* v. *Russell*, 194 N.E. 65; *People* v. *Yeager*, 182 N.Y. S.2d 910; *People* v. *Elmore*, 14 N.E.2d 451.

[5] Constitution, Art. II, § 11: "In all criminal prosecutions the accused shall enjoy the right to... and to be presumed innocent." *Cf. People* v. *Wells*, 202 P.2d 53, 63; *People* v. *Scott*, 151 P.2d 517, 520–21.

circumstances from which the jury may make a rational inference. *Cf. People* v. *Cruz*, 42 P.R.R. 879, 883–84; *People* v. *Méndez*, 74 P.R.R. 853, 866; *People* v. *Cortés*, 79 P.R.R. 769, 780; *State* v. *Steward*, 38 S.E.2d 29; *People* v. *Cartwright*, 305 P.2d 93; *People* v. *McAuliffe*, 316 P.2d 381; *State* v. *Lamm*, 61 S.E.2d 188; *People* v. *Cole*, 301 P.2d 854; *State* v. *Bowser*, 199 S.E. 31.

Notwithstanding the foregoing, we are convinced that the instruction given could not cause substantial prejudice to appellant. It was given at the commencement of some lengthy instructions which dealt in detail with the elements of murder in each of the degrees, which had to be proved.

▆▆ In the sixth assignment of error appellant complains that the judge imposed on him the burden of showing absence of malice, in instructing the jury that "in the case of manslaughter, the circumstances under which the victim's death is produced, there must be shown lack of malice, that is, there must be shown lack of wickedness." Further on: "[N]aturally, I repeat, that a verdict of manslaughter is justifiable only if you are convinced that the defendant acted without malice..." Although it would have been more proper to say that a verdict of homicide was justifiable if the jury was not convinced beyond a reasonable doubt that the defendant acted with malice, or if the jury entertained a reasonable doubt that he acted with malice, the appellant's interpretation that he was shifted the burden of proof is without support in the light of other instructions on this point. The judge spoke to the jury in general terms on the law of manslaughter, and instructed them that in this case the circumstances of the death should show lack of malice, which is correct. He did not refer to the evidence in the case nor to either party in particular.

▆▆ The seventh assignment of error relates to these instructions on homicide, and it is alleged therein that the judge gave instructions on presumptions against the exist-

ence of provocation and deprived the jury of their power to pass upon this point, as a matter of fact. We have examined the instruction challenged by the appellant, and the imputation is without basis. The fact that the judge said, speaking in general terms, that there might be homicide "when there is no evidence" that the defendant would have been pondering and designing a plan to kill, did not have the effect of charging the jury that if there was evidence in the case on such points they could not consider other evidence on provocation.

In the fifth assignment of error the appellant complains that he was deprived of the reasonable doubt and the benefit of the doubt as respects lesser degrees of the crime by the instructions which the judge gave to the jury: "If you believe that the acts occurred as recited by the witnesses for The People, it is, *without doubt*, a case of murder in the first degree if the elements of lying in wait,[6] deliberation, and malice aforethought were established." The error was not prejudicial. Although it is true that the facts, as related by the witnesses for The People, could also give rise to a verdict of murder in the second degree, depending on whether the jury believed some of the witnesses for the prosecution and not all of them, and that anyway it is for the jury to determine the degree of the offense, the judge explained that the elements of deliberation and malice aforethought had to be established. Shortly before he had told them that it was their duty to bring a verdict of murder in the first degree if they were satisfied that the defendant had killed with deliberation and malice aforethought, that he had planned beforehand what he was going to do, had waited for the victim to come out suddenly, firing at him and killing him.

---

[6] Although a prosecution witness testified that the appellant was "squatted" behind a drum and that he fired when the victim approached him, the information did not cover the modality of the death perpetrated while lying in wait, nor were instructions of law given on this point.

The other instruction challenged in this assignment presents a more serious situation. "If an individual boasts or says publicly that he is going to kill a person and then kills him, *there is no doubt* that it is a *clear and conclusive* case of deliberate death, of premeditated death, of malicious death, a death *which without doubt* makes that act an offense of murder in the first degree, *without room for doubt.*" Under the circumstances of this case, such exposition of the law could have been highly prejudicial and confuse the jury, particularly if we consider this other instruction challenged in the tenth assignment, given at the end of the instructions, in which the judge referred this time specifically to the facts of the case and to the appellant: "Of course, if you believe that he had the preconceived purpose of killing another, if you believe that he had already conceived the idea to kill another, *only* one verdict would be possible, *even though there was some quarrel, some provocation*: murder in the first degree."

Under the circumstances of this case, we repeat, these instructions could have been prejudicial. There was evidence before the jury that the previous day the appellant said to one person that if he did not wish to be his witness in order to sue Loreto Rivera, he would kill him like a dog, referring to the victim, and the next day he killed him. In view of those facts, the manner in which those instructions were categorically given, without any doubt as a clear and absolute case of murder in the first degree, the jury was bound to bring this verdict only. However, there was also evidence before the jury, closer to the moment the events took place, that the victim had said that he was going to kill the appellant as soon as he came across him, that he had called him a thief, and that the appellant heard it; that one week prior thereto the victim had personally called him a thief and that he was going to shoot him; and there was evidence before the jury, at the moment of the killing, of "take this, you thief,"

followed by a movement of the hand of the victim in which he had a bottle which looked to the appellant (there is no controversy on the fact that the place was dark or semidark) like a shining weapon.

 In view of the disclosures of the record, it was solely incumbent on the jury, if they were convinced after weighing and closely examining the entire evidence, to determine definitely whether or not the death was the result of deliberation and premeditation; whether it was perpetrated in execution of a previously deliberated and premeditated will or intention to kill, or, if notwithstanding the statement made by the killer the day before, whether the death was prompted by the circumstances and events which occurred or developed subsequent thereto or by a provocation. Provocation of a kind which is insufficient to fully negative a reasonable doubt as to the idea of malice aforethought, thereby reducing the offense to manslaughter, said the Supreme Court of California in *People* v. *Thomas*, 156 P.2d 7, 19, might nevertheless be sufficient or adequate to negative or raise a reasonable doubt as to the idea of deliberation or premeditation, leaving the homicide as murder of the second degree. *Cf. People* v. *Barberi*, 43 N.E. 635 (N.Y.). As stated in *People* v. *Palóu*, 80 P.R.R. 351, 371 (footnote 9), murder in the first degree requires a more specific mental condition than malice aforethought, because the wilfulness, premeditation, and deliberation which characterize it constitute a most particular combination which evidences a specific purpose to kill a human being. See *People* v. *Blanco*, 77 P.R.R. 726, where in citing from California to the effect that malice aforethought, deliberation, and premeditation are not synonymous, we said that a specific intent to kill does not import and is not equivalent to premeditated and deliberate killing.

 To state that one is going to kill another is unquestionably an affirmative fact on which the jury may ex-

pressly determine malice aforethought: the manifestation of a deliberate intention to take away the life of a fellow creature, cf. *People* v. *Gorshen*, 336 P.2d 492; *People* v. *Cox*, 153 P.2d 362; *People* v. *Greig*, 95 P.2d 936—malice aforethought being an ingredient of murder, whether of the first or second degree. *Cf. People* v. *Lewie*, 344 P.2d 861; *People* v. *Cayer*, 228 P.2d 70; *People* v. *Bender*, 163 P.2d 8. Such statement may also be a fact from which the jury may infer a deliberate and premeditated death—a sole characteristic of murder in the first degree—depending on all the other facts and circumstances appearing from the evidence; a death which requires a process of meditation and thinking; turning the fact in the mind, weighing the decision to kill and the reasons for and against a certain course of action to be taken and conscious of its consequences, and a specific intention to kill as a result of such process of meditation and thought. *Cf. People* v. *Robillard*, 358 P.2d 295; *People* v. *Carmen*, 228 P.2d 281; *People* v. *Honeycutt*, 172 P.2d 698; *People* v. *Bender*, *supra*; *People* v. *Thomas*, *supra*; *People* v. *Valentine*, 169 P.2d 1; *People* v. *Parrott*, 344 P.2d 643; *People* v. *Keeling*, 312 P.2d 407. It was for the jury to determine whether or not the statement by the appellant the day prior to the killing constituted, in the light of all the facts and circumstances, deliberation and premeditation, and if so, it was also its duty to determine whether or not the death was the product of such deliberation and premeditation; or, notwithstanding the statement, it was only the result of malice aforethought or of other circumstances on which there was evidence in the record. The determination of which was the state of mind and conscience of the killer which prompted the act of taking the life at that moment, was an exclusive function of the jury. In this sense, those instructions invaded that function. Although instruction was given on the law as to murder in the second degree and as to manslaughter, under the circumstances of this case, and bearing also in

mind the situation to which we shall refer in considering the thirteenth assignment of error, those instructions could have been prejudicial. The foregoing also disposes of the eighth and tenth assignments of error.

The defense having argued certain exceptions, the judge called back the jury which was already deliberating and instructed them again in an effort to clarify the previous situation. We have examined those instructions and can not agree that the situation was adequately corrected. Although the judge made it clear that if a person feared that someone was going to kill him and got hold of a firearm and thought he might be involved in a killing in self-defense, that was not the deliberation required in murder in the first degree, which undoubtedly favored the defendant, the judge ratified nonetheless the previous concept that if the killing was planned beforehand, such killing was murder in the first degree, repeating, *"even if there is fight and even if there is quarrel."* The judge probably meant a fight or a quarrel which would provoke the killer as part of the execution of a preconceived plan. But since there was no evidence that at the time of the killing the appellant started the fight or provoked Rivera, the original instruction given, which he repeated later, might induce the jury to believe that he meant any provocation or quarrel, even if the victim started it; and that if they did not find that self-defense was justified, they could not determine the degree of the offense considering all the other facts and circumstances of the death.[7]

The ninth assignment alleges that it was error to instruct that if the defendant had started the quarrel, such fact eliminated the possibility of a sudden quarrel and the

---

[7] At the termination of these additional instructions the foreman of the jury announced that they had reached a verdict. The judge directed them to retire to deliberate and ordered that they be furnished with additional blank forms in case they wished to make some change. At a subsequent hearing of a motion for a new trial it was revealed that that verdict was murder in the first degree.

reduction of the offense to manslaughter. The eleventh assignment alleges that the jury was instructed that if the defendant used excessive and unnecessary force, such action barred a verdict of manslaughter; and the twelfth assignment alleges that instruction was given that if the defendant started the fight, he had no right to plead self-defense. We have examined the instructions on this point and they are substantially correct, although some concepts in certain respects called for qualification. We need not discuss the alleged errors, since there was complete lack of evidence that at the time of the killing the appellant in some way provoked the victim or started a fight or quarrel with him. Although ordinarily an instruction stating principles of law applicable to situations of fact which do not appear from the evidence is erroneous, *cf. People* v. *Deloney*, 264 P.2d 532; *People* v. *Sánchez*, 184 P.2d 673; *People* v. *Silver*, 108 P.2d 4, any error or omission which might have been committed on those points did not affect the case directly.

██ Yet, instructions of law were given in connection with the theory of self-defense relied on by appellant which, in view of the situation revealed by the evidence before the jury, were highly prejudicial. Although those instructions were not covered in an assignment of error, we must consider them.[8]

---

[8] Act of March 12, 1903. This Court "will not confine itself only to violations of law or of form, as they are pointed out, alleged, or excepted to by the litigants, or as stated in their expositions and exceptions, but in the administration of justice the court may also take cognizance of all the facts and proceedings in the cause as they appeared in the record, likewise considering their merits for the better administration of justice and of the law and prevent injustices and delays." See Act of May 30, 1904: "...*Provided, however*, that the appellate court may take cognizance of fundamental errors appearing in the record, although not excepted to, and render such judgment thereon as the facts and the law may require." *Cf. People* v. *Sanjurjo, supra; People* v. *Rosado*, 78 P.R.R. 416; *People* v. *Barrios*, 23 P.R.R. 772, 779; *People* v. *Díaz*, 10 P.R.R. 441, 448; *Rivera* v. *Heirs of Lugo*, 42 P.R.R. 183; *Reyes* v. *Reyes*, 76 P.R.R. 266, 275; *Rivera* v. *Crescioni*, 77 P.R.R. 43, 69.

Sections 52 and 54 of the Penal Code—33 L.P.R.A. § § 99 and 101—provide that resistance sufficient to prevent the offense may be made by the party about to be injured: "... (2) to prevent an offense against his person or his family or some member thereof." "The right to self-defense in no case extends to the infliction or more harm than is necessary for the purpose of defense." To justify a homicide on the ground of self-defense, according to § 54, there must be not only the belief but also reasonable ground for believing that at the time of killing the deceased, the party killing was in imminent or immediate danger of his life or great bodily harm. The circumstances must be such as to induce the mind of a reasonably prudent person to entertain the belief that the defendant was in peril of his life or great bodily harm. According to § 209 of the Penal Code—33 L.P.R.A. § 641—homicide is justifiable when committed by any person...(3) "in the lawful defense of such person..." when there is reasonable ground to apprehend a design "to commit a felony, or to do some great bodily injury, and imminent" danger "of such design being accomplished." According to § 210— § 642—a bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of § 209 is not sufficient to justify the homicide. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

▮ The judge instructed that there must be a situation of danger, an apparent situation of peril to the defendant, not a bare suspicion; an actual and true peril might not exist and the killer, upon confronting the situation, could believe that he was in imminent danger of losing his life or suffering great bodily injury. He also instructed that the trier ought to put himself in defendant's place and determine, on the basis of the situation in which he found himself at that moment, whether there was basis to fear that his life was

in danger, or that he was likely to receive great bodily harm from Loreto Rivera when he fired the shots. The foregoing was correctly stated. The doctrine of apparent danger governs in our jurisdiction. See *People* v. *León*, 53 P.R.R. 408; *People* v. *Chico*, 45 P.R.R. 486; *People* v. *Serrano*, 35 P.R.R. 309. *Cf. People* v. *Hatchett*, 146 P.2d 469; *People* v. *Vezerian*, 193 P.2d 944; *People* v. *Cornett, supra; People* v. *Glover*, 74 Pac. 745; *People* v. *Coleman*, 180 N.Y.S.2d 978; *People* v. *Herbert*, 61 Cal. 544; *State* v. *Ellerbe*, 28 S.E.2d 519 (N.C.); *Scott* v. *State*, 34 So. 2d 718 (Miss.).

But the jury was forthwith told the following, which under the circumstances of this case, as a question of reality, practically annulled and set aside the previous instruction:

"Of course, that *is not the only thing* that is necessary to relieve a person from responsibility on the ground of self-defense. It is not merely that he believes that his life is in danger and for that reason alone he is relieved from responsibility. There are other requisites *which must also be present* in order to relieve an individual from responsibility.

"In the first place, you are authorized to use violence, force, *to repel an assault;* you are authorized to make use of the necessary force to repel that assault, that is, you can not take advantage of a situation brought about by the other party and then inflict more harm to the victim than is necessary to control that situation. For example, if a person attacks me, a person having the same physique as mine, has attacked me with his fists, lands me a blow or s.aps me, I am not justified in taking a revolver and discharging it at him, because I can repel the assault in the same manner he assaulted me; I can repel it with my fists. *Therefore, if the person exceeds himself in repelling an assault and uses more force than is necessary to repel it, he exceeds himself, there is no self-defense even though the person feared at the beginning, because of the circumstances present, that he was in danger of receiving great bodily injury and even death."* (Italics ours.)

The judge further instructed on the principles applicable to the use of justified force to repel an assault, and said:

"If you believe that the events occurred as related by the defendant or in an analogous or similar manner, you may apply those principles on which I have instructed you in determining whether you believe that the defendant, when he confronted Loreto Rivera, at the distance he was from the other, in the circumstances in which he found himself, from what he was able to observe, because of the previous disagreements between them, if his fear was founded, if he was justified at that moment to believe that his life was in danger or that he was about to receive great injury from the hands of Loreto Rivera. *In the second place, it is your duty to determine whether the defendant did not use more force than was necessary to repel that assault.*

"If you believe that the defendant did not exceed himself, if you believe that *the assault or attempt of assault* came from Loreto, in that case it is your duty to determine whether or not the accused exceeded himself in repelling *that assault,* or whether the defendant used that weapon because it was necessary and fired all those shots at Loreto in order to repel *that assault;* or, on the contrary, if you believe that the defendant exceeded himself and unnecessarily fires successive shots at the other, despite the fact that the other attempted to bring on *the assault;* if you believe that he exceeded himself, there is no self-defense, in which case there would be one of the three offenses on which I have instructed you: murder in the first degree, murder in the second degree, or involuntary manslaughter." (Italics ours.)

Lastly, in summing up the possible verdicts, the judge again stated:

"Lastly, if you believe that the defendant acted in self-defense, if you believe that the defendant killed Loreto Rivera when confronted with a situation which he could reasonably fear, and which any person of moderate courage, under like circumstances, would have feared; in view of the circumstances surrounding the relations of these two persons; the manner in which they met each other and his conduct, that the defendant's life was in danger, or that he was about to suffer great bodily injury, *and* if you believe that the defendant *acted in repelling an assault or attempt of assault on the part of Loreto Rivera against the defendant;* if you believe that the defendant did not exceed him-

self in using more force than was necessary, more violence than was necessary, but repelled *the assault* in the way it had to be repelled; if you believe that the defendant did not exceed himself, at least on the basis of the picture which has been described to you, that he was justified in *repelling the assault* in that manner, considering the previous difficulties between them, in that case it is your duty to acquit him of the offense of murder with which he is charged as would be the case if you had a reasonable and founded doubt as to whether or not the defendant acted in self-defense." (Italics ours.)

As we have said, the instruction on apparent danger of losing one's life or receiving great bodily injury conforms to law. Taken separately, and as an abstract expression of the law, the instructions on the degree and justified means of force to repel an assault against the killer were not incorrect. It was error, however, to instruct the jury that in order that there be self-defense as a matter of law, it is not sufficient that the person believe that his life is in danger, but that other requisites *must also be present* and that they refer to the occurrence of an assault. Our legal precepts do not require such concurrence. They only require that there be the killer's belief and reasonable ground for such belief that he was in imminent and immediate danger of death or of great bodily harm (§ 54) ; reasonable ground to apprehend a design to commit a felony, etc., and imminent danger of such design being accomplished (§ 209). The imminent danger that such purpose take place does not necessarily require an assault. *Cf. State* v. *Radon,* 19 P.2d 177, 181; *Sessums* v. *State,* 72 S.W.2d 249 (Tex.) ; *State* v. *Crutcher,* 1 N.W.2d 195, 198 (Iowa) ; *State* v. *Blackstone,* 154 S.E. 161 (S.C.) ; *Scott* v. *State, supra; Puryear* v. *State,* 98 S.W. 258, 264 (Tex.) ; *People* v. *Governale,* 86 N.E. 554 (N.Y.) ; *McCampbell* v. *State,* 174 S.W. 345, 348 (Tex.) ; *cf. People* v. *Rogers,* 331 P.2d 163.

Of course, it is not sufficient that the defendant believe that he was in such a situation of imminent danger or

apparent imminent danger, and if he kills, he runs his chances that a jury, as persons of moderate prudence, will not believe from the facts and circumstances presented, that he was in such danger, since it is not only the killer's belief but that a reasonable person of moderate courage, faced with the same situation and the same facts, would have been justified in believing that he was in danger of losing his life.

 Under the circumstances of this case in which the appellant only relied on self-defense, since he admitted the fact of the killing, and in which there was no personal encounter since the victim was at some distance from him when he fired at him, those instructions were more liable to be seriously prejudicial. Although the judge in instructing on the use of violence assumed and parted from the premise, even though he could have done it through inadvertence, that the gesture or movement of the deceased with the hand in which he was carrying a bottle constituted an assault or attempt of assault, the jury was the one called upon to make such a determination. If the jury believed, and this seems to be the presumption, that the judge instructed them that that was an assault or attempt of assault, it was obvious that they should conclude that undue force was used *to repel* it, under the present circumstances. If, on the contrary, they believed, arriving at such conclusion, that there was no assault in the case, according to the instructions given, they could believe that there was no self-defense because such requisite was not present, although they could be of the opinion in the light of other facts in the record, that the appellant could believe, and that there was reasonable ground to believe, that he was in imminent danger of losing his life or of great bodily injury.

 The thirteenth assignment refers to the instructions in general. It is alleged that the judge instructed so emphatically and argumentatively as to convey his opinion on the merits of the case and the verdict which they ought

64

to bring. Among other contentions, the appellant maintains that the instructions placed great emphasis on murder in the first degree, thereby emphasizing this degree of the offense. The question must be evaluated on the basis of the whole of the instructions as a single body or statement of the judge to the jury, not piecemeal or isolated remarks and statements. We should likewise balance their effects, whether or not prejudicial, in that respect. With this cardinal principle in mind, we have closely examined the problem under consideration, and even though we are convinced that it was not the judge's manifest or conscientious purpose to indicate or suggest a specific verdict to the jury, we are inclined to believe that the instructions might have conveyed to the jury the impression or have the effect alleged by the appellant.[9] It would be prolix to cite specific portions, although they stand out in the record, and we would have to reproduce here practically all of the instructions in order to make a balanced

---

[9] Possibly that was the result, as stated by the judge at a subsequent hearing for the nullity of verdict and new trial, of his giving lengthy and elaborate instructions "which were not read but rather in the form of a conversation, in an effort to convey to the jury all the concepts of law to enable them to do justice." The essential facts heard in this case were relatively few and simple. The fundamental purpose of instructions is to illustrate the jury on the law applicable to the facts presented to them, and they bear on all those principles of law conceivably applicable to such facts, but they do not amount to a dissertation or general thesis on the case. That is why instructions on principles of law which, although correct in their exposition, are not applicable to any situation of fact arising or which may be inferred from the evidence, are as a general rule considered erroneous, although not always necessarily reversible, because they tend to confuse the jury. In this case it appears that great emphasis was placed on the instructions, including the additional instructions, on the situation in which a defendant who has deliberated and conceived the purpose to kill starts a provocation or quarrel with the victim as part of his preconceived plan to kill him, and thus appear that he did not commit murder but a misdemeanor. There was no evidence that the appellant started a provocation or quarrel with the victim at the time he killed him, but the jury could suspect, in view of the emphasis placed on that situation, that those acts could in some way be inferred from the evidence. Frequently, perhaps more often than is advisable, attempts were made to illustrate principles of law by hypothetical examples of fact. This

evaluation thereof. The statement of the law ought to be as complete and clear as is necessary for the jury, but those principles of law which characterize the elements of a specific offense or degree of offense, if several offenses are included, should not be emphasized more than others. There is the danger that the jury might believe that the judge has preference for that offense or degree. In a prosecution for murder in the first degree, even though the jury believes the facts as they appear from the evidence for the prosecution, the determination of the degree of the murder is its exclusive function within its also exclusive function of evaluating the facts and resolving its doubts.

The fourteenth assignment alleges that it was error to direct the jury to continue deliberating after they informed that they had reached a verdict. It refers to the incident which took place when the judge called back the jury in order to give additional instructions. The fifteenth error alleges that it was error to permit that the verdict be revealed while a motion for a new trial was being argued. We will not consider these assignments. Aside from the fact that the appellant does not discuss them, it is not necessary in view of the disposition of the case.

In view of the cumulative effect of all the foregoing statements made in this opinion upon discussing the several assignments of error, a new trial will be granted.

---

should be avoided as much as possible, since there is the danger that the jury might believe that the hypothetical facts illustrated by the judge are in some way inferred or arise from the evidence; that the jury might believe that the judge accepts as proved certain situations of fact if they are similar to those covered by the example, or that the illustration does not cover all the situations of fact to which the principle of law illustrated applies. It is preferable to let the jury infer from the evidence all such situations of fact as may come within the principles of law illustrated, and to make such conclusions as in their opinion were proved according to those principles. *Cf. State* v. *Haesemeyer*, 79 N.W.2d 755, 761 (Iowa); *Dees* v. *Commonwealth*, 314 S.W.2d 514, 517 (Ky.); *People* v. *Jackson*, 268 P.2d 6, 10; *People* v. *Roe*, 209 Pac. 560.